Bruce Erwin **LEADON**, Appellant,

v.

The **STATE** of Texas, Appellee.

Nos. 01–08–00839–CR, 01–08–00840–CR.

Court of Appeals of Texas, Houston (1st Dist.).

Jan. 14, 2010.

602

Lana Gordon, Houston, TX, for Appellant.

Kenneth Magidson, Michelle Ruth Townsend, Harris County District Attorney, Houston, TX, for Appellee.

Panel consists of Chief Justice RADACK and Justices ALCALA and HANKS.

## OPINION

GEORGE C. HANKS, JR., Justice.

Appellant, Bruce Erwin Leadon, was charged twice with aggravated robbery with a deadly weapon for robbing the same restaurant on two separate occasions. *See* TEX. PENAL CODE ANN. §§ 29.02, 29.03 (Ver-non 2003). The offenses were tried together, and a jury found appellant guilty of both offenses and assessed punishment for each offense at sixty years' imprisonment to run concurrently and a $5,000 fine. In three issues, appellant contends that: (1) the evidence supporting his convictions is legally and factually insufficient; (2) the trial court erred in denying his *Batson* challenge to the State's peremptory strikes; and (3) the trial court erred in refusing to allow his mother to testify during the punishment phase that appellant is mentally challenged. We affirm.

## Background

Appellant was convicted of robbing the same Waffle House restaurant twice, once on May 12, 2007 and again on June 20, 2007, with his half-brother, Terence Briscoe. Both robberies took place during the early morning hours. The Waffle House was located within walking distance and less than a mile away from the apartment that appellant and Briscoe shared with their parents.

In the early hours of the morning on May 12, 2007, appellant and Briscoe entered the Waffle House on Almeda–Genoa Road and chose a corner booth. Karon Blackmon, a waitress at the restaurant, approached the two men to provide menus and silverware and to take their order. After serving appellant and Briscoe, Blackmon left their ticket at the table for payment. Blackmon testified that the restaurant was "[e]xtremely" busy and she was not able to observe everything that the men were doing because she had other customers. However, she noticed that appellant was doodling on his napkin. Appellant and Briscoe approached the cash register, as if to pay for their meal, but instead, Briscoe placed a gun to Blackmon's forehead. Blackmon testified she "basically blacked out" and only remem-

bers backing away from the register with her hands up. Blackmon feared for her life. Briscoe followed her with the gun continuing to point it at her head, and once she backed away from the register, appellant came around the counter, "opened the register, got the money, put it in a backpack and they ran out."

When the cook at the restaurant realized what was happening, she ran to the motel next door to call the police. Officer Wyatt of the Houston Police Department ("HPD") was one of the first officers on scene. Officer Wyatt testified that she attempted to lift fingerprints off of the ketchup and syrup bottles on the table at which appellant and Briscoe sat. Wyatt also tagged the pair's receipt and the napkin on which appellant was doodling for further examination by the HPD crime lab. At trial, Officer Wyatt read several phrases from the napkin, including, "Money, money, money is my intuition. Money over bitches. Such an easy decision." Wyatt testified that "names of gangs" were also written on the napkin.

HPD Officers Rowe and Werner testified that the HPD crime lab found one usable fingerprint on the receipt, but it did not match appellant, Briscoe, or their waitress, Blackmon. Officer Werner compared the print with all of the prints in the Automated Fingerprint Identification System (containing prints of all individuals arrested by HPD and all HPD officers) but did not find a match. However, testimony was given that another waitress and the cook touched the receipt and, thus, either could have left the print.

Blackmon testified that she provided police with a description of the two men. She did not expect to ever see the men again, but said she could never forget the faces of the men who committed the robbery. Scared from the ordeal, Blackmon took some time off work, but eventually returned.

Blackmon was working the late night shift again on June 20, 2007. June 20 was "a slow night," and there was only one customer, an older man. Only two employees were working that shift: Blackmon waited tables, while Nina Christian cooked the customers' orders. Christian was a new employee, and June 20 was her second night on the job. At around 4:00 a.m., Blackmon took a cigarette break. While Blackmon was on her break, appellant came into the restaurant, this time alone and speaking on a cell phone. After telling Christian he wanted to place a to-go order, he proceeded to the restroom. Christian alerted Blackmon that a customer wanted to place an order. When Blackmon returned from her break, she went to the register where appellant was standing. Blackmon testified that she "couldn't stop staring at [appellant]" because she was certain she recognized him from somewhere but could not immediately place his face. Appellant avoided making eye contact with Blackmon and kept his head down. Then, Blackmon looked up, and through the front window, saw Briscoe approaching the restaurant carrying the "same old backpack" used in the first robbery. Upon seeing Briscoe, Blackmon testified that "it click[ed]." After Blackmon realized that these men were the same men that robbed the store in May, she ran to the back exit. As Briscoe entered the restaurant, appellant left without picking up his order. When Blackmon reached the back door and looked back toward the cash register, Briscoe "was pointing the gun at [Christian.]" Blackmon ran out the back door to the motel next door and called 911. While pointing the gun at Christian, Briscoe moved towards the cash register, opened it, and filled his backpack with money. Christian testified that she was afraid she might be killed.

When the police arrived, Blackmon told the officers that the robbers were the same men that robbed the store in May. Sergeant Nieto of the HPD Robbery Division began investigating the two robberies. Sergeant Nieto created photo arrays containing the pictures of appellant and Briscoe. Both Christian and Blackmon positively identified the two men from the photo arrays. Christian and Blackmon also identified appellant at trial.

Appellant offered four alibi witnesses, all of whom testified that they distinctly remember appellant being at home on both May 12, 2007 and June 20, 2007. Appellant and Briscoe shared a room at their mother and stepfather's apartment, and had a strict curfew of 11 p.m. Their stepfather testified that, because appellant and Briscoe were unemployed, he set strict rules that the men be home by 11 p.m., wake by 6 a.m., and spend the day looking for work. Both appellant's mother and stepfather testified that, on the two nights in question, appellant was at home when they went to sleep that night and when they got up in the morning.

The apartment had a front door and sliding patio door. At the time of the robberies, appellant's stepfather testified that, he had been sleeping on the couch so he could watch the front door to make sure that someone did not "break in." He testified that there had been a problem at the apartment complex with people "kick-dooring" the apartment doors to gain access. Because he was sleeping near the front door, appellant's stepfather testified that appellant and Briscoe could not have left the apartment during the night on the dates in question.

The patio door led to a second-floor balcony. The patio door was located closest to the room that appellant and Briscoe shared. However, their stepfather testified that he knew the men did not use the patio door to leave the apartment on the nights of the robberies because the railing on the balcony was loose and too weak to support the men's weight. Appellant's mother testified that they left the patio railing loose as a safety precaution so that people could not gain access to the second story patio. However, appellant's mother testified that it was possible to get up to the patio by climbing up to the next-door neighbors' patio and going around the neighbors' apartment.

## I. Legal and Factual Sufficiency

In his first issue, appellant contends the evidence supporting his convictions is legally and factually insufficient. Specifically, appellant argues that the evidence is insufficient to establish his identity as the perpetrator of the offense. Additionally, appellant contends that the evidence is insufficient to establish that he acted as a party to the June 20, 2007 aggravated robbery.

### A. Aggravated Robbery

In order to convict appellant of aggravated robbery, the State was required to prove beyond a reasonable doubt that appellant, acting as either a principal or a party, while in the course of committing theft, intentionally or knowingly threatened or placed a person in fear of imminent bodily injury or death while using or exhibiting a deadly weapon. *See* TEX. PENAL CODE ANN. §§ 29.02, 29.03 (Vernon 2003). A firearm is considered a deadly weapon. TEX. PENAL CODE ANN. § 1.07(a)(17)(A) (Vernon Supp. 2008).

### B. Law of Parties

A person is criminally responsible as a party to an offense if the offense is committed by their own conduct, by the conduct of another for which she is criminally responsible, or by both. TEX. PENAL

CODE ANN. § 7.02(a) (Vernon 2003). A conviction under the law of parties is appropriate if there is evidence that the defendant was physically present and encouraged the commission of the crime by words or other agreement. *Ransom v. State,* 920 S.W.2d 288, 302 (Tex.Crim.App. 1994) (op. on reh'g).

 Since an agreement between parties to act together in common design can seldom be proven by words, the State often must rely on the actions of the parties, shown by direct or circumstantial evidence, to establish an understanding or a common design to commit the offense. *Miller v. State,* 83 S.W.3d 308, 314 (Tex. App.-Austin 2002, pet. ref'd). The agreement, if any, must be made before or contemporaneous with the criminal event, but in determining whether the accused participated as a party, the court may look to events occurring before, during and after the commission of the offense, and may rely on actions of the defendant which show an understanding and common design to do the prohibited act. *Beier v. State,* 687 S.W.2d 2, 3–4 (Tex.Crim.App. 1985); *Miller,* 83 S.W.3d at 314. Circumstantial evidence may suffice to show that one is a party to an offense. *Wygal v. State,* 555 S.W.2d 465, 469 (Tex.Crim.App. 1977); *Miller,* 83 S.W.3d at 314.

 While mere presence at the scene is not enough to sustain a conviction, that fact may be considered in determining whether an appellant was a party. *Valdez v. State,* 623 S.W.2d 317, 321 (Tex.Crim. App.1979) (op. on reh'g); *Miller,* 83 S.W.3d at 314. If the evidence, however, shows the mere presence of an accused at the scene of an offense, without more, it is insufficient to sustain a conviction as a party to the offense. *Valdez,* 623 S.W.2d at 321; *Scott v. State,* 946 S.W.2d 166, 168 (Tex.App.-Austin 1997, pet. ref'd).

## C. Legal Sufficiency

### 1. Standard of Review

We review the legal sufficiency of the evidence by viewing the evidence in the light most favorable to the verdict and determining whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Cruz v. State,* 238 S.W.3d 381, 386 (Tex.App.-Houston [1st Dist.] 2006, pet. ref'd) (citing *King v. State,* 29 S.W.3d 556, 562 (Tex.Crim.App.2000)). The trier of fact is the sole judge of the weight and credibility of the evidence. *Margraves v. State,* 34 S.W.3d 912, 919 (Tex.Crim.App. 2000). Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact-finder. *Dewberry v. State,* 4 S.W.3d 735, 740 (Tex.Crim.App.1999). We must resolve any inconsistencies in the evidence in favor of the verdict. *Curry v. State,* 30 S.W.3d 394, 406 (Tex.Crim.App.2000).

### 2. Analysis

 Appellant contends that the evidence is legally insufficient to support his convictions. Specifically, appellant argues the evidence is insufficient to establish his identity in the May robbery and to show that appellant was a party to the June robbery.

Blackmon testified that, on May 12, 2007, appellant and Briscoe entered the Waffle House together and ate a meal, prior to robbing the restaurant. The two men approached the register, as if they were going to pay for their meal, but instead, Briscoe pointed a gun at Blackmon's forehead. Blackmon testified that Briscoe was about two feet away from her when he pointed the gun at her head. Blackmon was in fear for her life and backed away from the register with her hands up. Appellant opened the cash reg-

ister and took out all of the money, while Briscoe continued pointing the gun at Blackmon. Blackmon positively identified appellant in a photo line-up and in court as the man who robbed the restaurant on May 12, 2007.

Christian testified that, on June 20, 2009 around 4:00 a.m., appellant entered the restaurant, while talking on a cell phone, placed a to-go order, and went into the restroom for about five minutes. Appellant left without picking up the order. As appellant was exiting, Briscoe entered with his gun drawn, pointed the gun at Christian, and emptied the money in the register into his backpack. Christian testified that she was afraid she would be killed. Blackmon and Christian both identified appellant as the man who was in the restaurant immediately before Briscoe threatened Christian with the gun and took the money from the register.

Although appellant points to the alibi evidence he presented at trial, the record shows that witnesses positively identified him as one of the perpetrators. Blackmon positively identified appellant in a photo line-up and in court as the man who robbed the restaurant in May. Both Christian and Blackmon positively identified appellant in a photo line-up and in court as the man who entered the restaurant just before Briscoe on the night of the June robbery. The identification of appellant by the eye-witnesses is sufficient to support appellant's convictions. *See Davis v. State,* 177 S.W.3d 355, 359 (Tex.App.-Houston [1st Dist.] 2005, no pet.) ("It is well established that a conviction may be based on the testimony of a single eyewitness."); *Harmon v. State,* 167 S.W.3d 610, 614 (Tex.App.-Houston [14th Dist.] 2005, pet. ref'd) (holding witness's testimony identifying appellant is sufficient, standing alone, to support conviction); *Aguilar v.*

*State,* 468 S.W.2d 75, 77 (Tex.Crim.App. 1971).

As to whether appellant was a party to the June 20 robbery, given appellant's active role in the earlier robbery with Briscoe six weeks earlier under similar circumstances—i.e., they appeared as customers immediately before the offense, appellant was present at the Waffle House just seconds before Briscoe entered with a gun, appellant's placing a to-go order was a ruse because appellant did not pick up the order when he left the restaurant immediately before the offense, and the close relationship between appellant and Briscoe, a juror could have reasonably found that appellant encouraged, aided, or attempted to aid Briscoe by, for instance, informing him via cell phone of the conditions inside the restaurant, creating a distraction just prior to the robbery, and serving as a lookout while Briscoe pointed the gun at Christian and emptied the cash register. There is evidence in the record indicating that appellant was acting with Briscoe under a common scheme. *See Wygal,* 555 S.W.2d at 469 (holding that circumstantial evidence may suffice to show that one is a party to an offense); *see also Miller,* 83 S.W.3d at 314. Viewing the evidence in a light most favorable to the jury's verdict, the record shows that appellant acted as a party to the June 20, 2007 aggravated robbery.

As to both offenses, a rational jury could conclude from this evidence that appellant, acting as a party, while in the course of committing theft, placed Waffle House employees in fear of imminent bodily injury or death while using or exhibiting a deadly weapon, namely, a firearm. TEX. PENAL CODE ANN. §§ 29.02 & 29.03. Therefore, the evidence is legally sufficient to support the jury's verdicts of guilt.

## D. Factual Sufficiency

### 1. Standard of Review

When conducting a factual sufficiency review, we view all of the evidence in a neutral light. *Brown v. State*, 212 S.W.3d 851, 859 (Tex.App.-Houston [1st Dist.] 2006, pet. ref'd) (citing *Ladd v. State*, 3 S.W.3d 547, 557 (Tex.Crim.App.1999)). We will set the verdict aside only if (1) the evidence is so weak that the verdict is clearly wrong and manifestly unjust or (2) the verdict is against the great weight and preponderance of the evidence. *Brown*, 212 S.W.3d at 859 (citing *Johnson v. State*, 23 S.W.3d 1, 11 (Tex.Crim.App.2000)). Under the first prong of *Johnson*, we cannot conclude that a conviction is "clearly wrong" or "manifestly unjust" simply because, on the quantum of evidence admitted, we would have voted to acquit had we been on the jury. *Brown*, 212 S.W.3d at 859 (citing *Watson v. State*, 204 S.W.3d 404, 417 (Tex.Crim.App.2006)). Under the second prong of *Johnson*, we cannot declare that a conflict in the evidence justifies a new trial simply because we disagree with the jury's resolution of that conflict. *Id.* Before finding that evidence is factually insufficient to support a verdict under the second prong of *Johnson*, we must be able to say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the jury's verdict. *Id.* In conducting a factual sufficiency review, we must also discuss the evidence that, according to the appellant, most undermines the jury's verdict. *Brown*, 212 S.W.3d at 859 (citing *Sims v. State*, 99 S.W.3d 600, 603 (Tex.Crim.App. 2003)).

We may not re-weigh the evidence and substitute our judgment for that of the fact-finder. *King v. State*, 29 S.W.3d 556, 562 (Tex.Crim.App.2000). The fact-finder alone determines what weight to place on contradictory testimonial evidence because that determination depends on the fact-finder's evaluation of credibility and demeanor. *Cain v. State*, 958 S.W.2d 404, 408–09 (Tex.Crim.App.1997). As the determiner of the credibility of the witnesses, the fact-finder may choose to believe all, some, or none of the testimony presented. *Id.* at 407 n. 5.

### 2. Analysis

Appellant contends that the evidence supporting his convictions is factually insufficient. Specifically, appellant argues that Blackmon was an unreliable witness because she admitted to being "in shock" during the first robbery, was unduly influenced by Nieto when she examined the photo arrays, and is a "convicted drug felon." Additionally, appellant argues that there was "no physical evidence" linking him to either robbery and that he has strong alibi testimony regarding both offenses.

Because the jury is the exclusive judge of the credibility of the witnesses and of the weight to be given their testimony, we cannot, on appeal, weigh the credibility of the witnesses. *See Barnes v. State*, 876 S.W.2d 316, 321 (Tex.Crim.App.1994). Here, the jury chose to believe the testimony of Blackmon and Christian and disbelieve that of appellant's alibi witnesses, and we cannot disturb the jury's determination. *See Losada v. State*, 721 S.W.2d 305, 309 (Tex.Crim.App.1986) (holding jury is sole judge of witness credibility and may believe some witnesses and refuse to believe others).

Appellant argues that Blackmon admitted her identification of appellant was tainted by police. This is a misstatement of the record. In his brief, appellant contends that a police officer told Blackmon that the photo of the suspect was in the photo array. To the contrary, Sergeant Nieto admonished Blackmon that the pho-

to array may or may not have contained a photograph of the suspect. Blackmon's testimony shows that she understood the admonishment, as she testified that she would not have circled one of the pictures if she did not see one of the individuals who committed the offense.

Also, appellant states in his brief that police officers told Blackmon how to spell "positive," instructing her to write that on the photo she chose. Again, appellant misstates the record. First, it is important to note that the testimony referred to marking of the photo array containing Briscoe's picture, not appellant's picture.[1] Moreover, Blackmon never testified that anyone told her how to spell "positive." Rather, she testified that she made a spelling mistake, crossed it out, wrote "positive" correctly, and then the officer asked her to initial the change to indicate that she made the change.

In his brief, appellant argues that "the prints clear him" from being the perpetrator of the May 2007 offense. This assertion is without merit. Testimony was given that another waitress and the cook touched the receipt on which the print was found. The fingerprints of those individuals were not taken and compared to the print left on the receipt. Because the evidence shows that other persons touched the receipt, it cannot be said that only the true perpetrator could have left the print in question.

Appellant states in his brief that "Christian said that Appellant was the man *simply* on the cell phone, not involved in the robbery." (Emphasis added.) This is also a misstatement of the record. When questioned about the photo array containing the picture, Christian testified "[t]hat's the first gentleman with the cell phone who is sitting in the courtroom." She never testified that appellant was not involved in the robbery. Appellant similarly misstates the record when he argues, "There was no testimony that Appellant was at all involved as a party to that 2nd robbery." Rather, Blackmon testified that the "same people" robbed the store again. The second robbery occurred around 4 a.m. on a slow night, when there was only one customer. Christian testified that appellant entered the restaurant around 4:00 a.m. and told her that he wanted to place a to-go order. Appellant was talking on a cell phone and went into the bathroom for about five minutes. Appellant left the restaurant without receiving the order he placed. As appellant exited the restaurant, Briscoe entered brandishing a weapon. Additionally, the jury could have properly considered the joint participation of Briscoe and appellant in the May robbery to decide that they had a similar plan to act together in committing the June offense. The circumstances of the June offense tend to show that appellant was not merely present but, rather, assisted in the robbery. *See Miller,* 83 S.W.3d at 314.

Appellant also points out the lack of physical evidence, such as video evidence, fingerprints, or DNA. However, the lack of physical evidence does not render the evidence supporting appellant's convictions factually insufficient. *Harmon v. State,* 167 S.W.3d 610, 614 (Tex.App.-Houston [14th Dist.] 2005, pet. ref'd). A rational jury could have found appellant guilty of aggravated robbery without DNA evidence, fingerprint evidence, or evidence of the gun or cash from the robbery. *Id.* (citing *Santos v. State,* 116 S.W.3d 447, 459

---

1. When shown the photo array containing appellant's photo, Blackmon circled appellant's photo and wrote, "positive both cases."

(Tex.App.-Houston [14th Dist.] 2003, pet. ref'd)).

In his brief, appellant argues that, "No one could say if the gun used was real or fake." This contention misrepresents the record. The eyewitnesses testified that Briscoe brandished a "gun" during the commission of both robberies. Specifically, Blackmon testified that, on May 12, 2007, Briscoe "had a gun pointed at [her] forehead" when she was standing "approximately two feet" away. Blackmon testified she feared for her life, which indicates that she believed the gun to be real. Christian testified that on June 20, 2007, Briscoe came into the restaurant with a gun drawn and pointed the gun at her. Christian feared she would be killed. Christian testified that the weapon was a "revolver" and described it as a "[d]ark gun, short nose, stub barrel, black handle." Trial counsel never asked Blackmon or Christian (the two employees at whom Briscoe pointed the gun) if the gun could have been fake.

There was no testimony given that the gun was fake. Trial counsel asked Deborah Farrar, a waitress on May 12, 2007, if she thought the gun was fake. Farrar testified that she saw the gun and believed it was real. Farrar said that she was familiar with pistols because her stepfather owned several. Sergeant Nieto testified that the witnesses reported that a revolver was used. Trial counsel questioned Sergeant Nieto on the possibility of the revolver being fake, and Sergeant Nieto responded that he "would think that someone would know a real gun from a fake gun."

 Testimony from a complainant in close proximity to a weapon, describing it as a "gun," a "revolver," and a "pistol," is sufficient to prove the use of a deadly weapon. *Wright v. State*, 591 S.W.2d 458, 459 (Tex.Crim.App.1979). It is true that courts have held that testimony regarding the use of a "gun" may be insufficient to support a finding of use and exhibition of a deadly weapon when the case presents separate evidence indicating the use of a toy gun. *See Pena Cortez v. State*, 732 S.W.2d 713, 715 (Tex.App.-Corpus Christi 1987, no pet.) (holding that testimony regarding use of "pistol" was insufficient where it was uncontroverted that "pistol" was toy gun). Here, there was testimony that described the weapon as a "gun" and a "revolver," and there was no evidence indicating that it could have been fake or a toy. Thus, the testimony is sufficient to satisfy the element that a deadly weapon was used. *See Wright*, 591 S.W.2d at 459.

Weighed in a neutral light, the evidence is not so weak that the verdicts are clearly wrong and unjust. *Laster v. State*, 275 S.W.3d 512, 518 (Tex.Crim.App.2009). Also, there is no objective basis in the record to conclude that the great weight and preponderance of the evidence contradicts the jury's verdicts. *Watson v. State*, 204 S.W.3d 404, 417 (Tex.Crim.App.2006). We hold the evidence is factually sufficient to support appellant's convictions for aggravated robbery.

We overrule appellant's first issue.

## II. *Batson* Challenge

In his second issue, appellant contends that the trial court erred by denying his *Batson*[2] challenge because the State used four of its eleven peremptory challenges to strike four of the five blacks from the venire panel. The State argues that appellant has not shown that the prosecutor's race-neutral explanations were a pretext and, therefore, that the trial court properly denied appellant's *Batson* challenge.

---

**2.** *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

## A. The Law

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Article 35.261 of the Texas Code of Criminal Procedure prohibit the use of peremptory challenges to exclude veniremembers on the basis of race. *See* U.S. CONST. AMEND. XIV, § 1; TEX.CODE CRIM. PROC. ANN. art. 35.261 (Vernon 2006); *Batson v. Kentucky*, 476 U.S. 79, 85, 106 S.Ct. 1712, 1716–17, 90 L.Ed.2d 69 (1986). In the face of perceived purposeful discrimination, the defendant may request a *Batson* hearing to address the challenge. *See* TEX.CODE CRIM. PROC. ANN. art. 35.261(a).

 Trial courts follow a three-step process when resolving *Batson* challenges. *Snyder v. Louisiana*, 552 U.S. 472, 128 S.Ct. 1203, 1207, 170 L.Ed.2d 175 (2008); *Young v. State*, 283 S.W.3d 854, 866 (Tex. Crim.App.2009). First, the defendant must make a prima facie showing that the State exercised a peremptory challenge on the basis of race. *Snyder*, 552 U.S. at 475–77, 128 S.Ct. at 1207; *Young*, 283 S.W.3d at 866. Second, if the prima facie showing has been made, the burden of production shifts to the State to articulate a race-neutral reason for its strike. *Snyder*, 552 U.S. at 475–77, 128 S.Ct. at 1207; *Young*, 283 S.W.3d at 866. A reason is deemed race-neutral if no discriminatory intent is inherent in the explanation given. *Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995). In the third and final step, the trial court determines whether the defendant has carried his burden to prove purposeful discrimination. *Snyder*, 552 U.S. at 475–77, 128 S.Ct. at 1207; *Young*, 283 S.W.3d at 866. Throughout the challenge, the burden of persuasion remains with the defendant, who may continue to rebut the prosecutor's explanations before the trial court decides the *Batson* challenge. *Moore v. State*, 265 S.W.3d 73, 78 (Tex.App.-Houston [1st Dist.] 2008, no pet.) (citing *Purkett*, 514 U.S. at 768, 115 S.Ct. at 1771). The defendant must prove by a preponderance of the evidence that the allegations of purposeful discrimination were true in fact and that the prosecutor's reasons were merely a sham or pretext. *Watkins v. State*, 245 S.W.3d 444, 451–52 (Tex.Crim. App.2008).

## B. Standard of Review

 "On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." *Snyder*, 552 U.S. at 475–77, 128 S.Ct. at 1207. To hold that a decision was "clearly erroneous," we must be left with a "definite and firm conviction that a mistake has been committed." *Moore*, 265 S.W.3d at 78 (quoting *Goldberg v. State*, 95 S.W.3d 345, 385 (Tex.App.-Houston [1st Dist.] 2002, pet. ref'd)). Appellate courts must give great deference to credibility and demeanor determinations made by the trial court in connection with a *Batson* inquiry. *Snyder*, 552 U.S. at 477–79, 128 S.Ct. at 1208 (observing that "the best evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge"). We may not substitute our opinion for the trial court's factual assessment of the neutrality of the prosecutor's explanation for exercising strikes. *Gibson v. State*, 144 S.W.3d 530, 534 n. 5 (Tex.Crim.App.2004); *see Snyder*, 552 U.S. at 477–79, 128 S.Ct. at 1208 (holding "in the absence of exceptional circumstances," deference should be given to trial court). We view the evidence in the light most favorable to the trial court's ruling. *Young*, 283 S.W.3d at 866. We focus on the genuineness rather than on the reasonableness of the State's asserted race-neutral reason. *Gibson*, 144 S.W.3d at 533–34. In evaluating the genuineness of the State's prof-

fered race-neutral reasons, we consider "all of the circumstances that bear upon the issue of racial animosity[.]" *Snyder,* 552 U.S. at 477–79, 128 S.Ct. at 1208 (citing *Miller–El v. Dretke,* 545 U.S. 231, 239, 125 S.Ct. 2317, 2324, 162 L.Ed.2d 196 (2005)).

▓▓▓▓▓ When determining whether a race-neutral explanation was a pretext for purposeful discrimination, we examine whether comparative evidence demonstrates disparate treatment of minority venirepersons. *See Miller–El,* 545 U.S. at 241, 125 S.Ct. at 2325. If a prosecutor's race-neutral reason for striking a minority venireperson applies equally to an otherwise similar non-minority venireperson who the prosecutor does not challenge, this may be evidence that the race-neutral reason is a pretext for purposeful discrimination. *See id.* We cannot, however, automatically impute disparate treatment in every case in which a reason for striking a minority venireperson also technically applies to a non-minority venireperson whom the prosecutor found acceptable. *See Cantu v. State,* 842 S.W.2d 667, 689 (Tex. Crim.App.1992). The decision to strike a particular potential juror is not susceptible to rigid qualification. *Id.* As the Court of Criminal Appeals has explained, the decision to strike a venireperson "is a fluid process, often hinging on the interaction of a number of variables and permutations" and it "is unlikely that two venirepersons on one panel will possess the same objectionable attribute or character trait in precisely the same degree." *Id.* Such differences, especially in light of a limited number of available peremptory strikes, may properly cause the State to challenge one potential juror and not another. *See id.* Accordingly, we must also look to the entire record to determine if, despite a similarity, there are any significant differences between the characteristics and responses of the veniremembers that would, under the facts of this case, justify the prosecutor treating them differently as potential members of the jury. *See Miller–El,* 545 U.S. at 247, 125 S.Ct. at 2329.

### C. *Batson* Hearing

In response to the State's exercise of its strikes, appellant's trial counsel asserted a *Batson* challenge, contending that the State struck four veniremembers because of their race. The record shows that a venire panel of sixty-four people was summoned for jury selection. Forty-two of these survived challenges for cause. Prior to the parties' marking of their peremptory strikes, the court announced that the strike zone ended at veniremember 52, with 53, 56, and 57 to be considered as alternates. The strike zone consisted of thirty-five veniremembers. Five of those thirty-five (14.29%) were black. Each side was allowed eleven strikes. The State used four of its eleven strikes (36.36%) to remove four out of five of the black panel members available to serve on the jury.

The trial court took judicial notice, recognizing that appellant and veniremembers 7, 8, 9, 14, and 31 were black. Of the five black panel members, the prosecutor struck panel members 7, 9, 14, and 31. Panel member 8 was not struck by either side and, ultimately, served on the jury. During the *Batson* hearing, the court asked the prosecutor to provide his reasons for striking panel members 7, 9, 14 and 31.

The prosecutor explained that he struck panel members 7 and 31 because they were both employed by the United States Postal Service ("USPS"). The prosecutor explained, "I've specifically had one case that was hung with a United States Postal Service worker. Also, my experience in talking with witnesses and juries after

cases have been resolved, I've experienced problems in regards to that as an occupation." The prosecutor added that panel member 31 originally indicated that she would not consider assessing a life sentence. The prosecutor stated that he struck panel member 9 because, like panel member 31, he initially indicated that he would not consider a life sentence. The prosecutor stated that he struck panel member 14 because she indicated that she had previously visited a loved one in prison on a felony.

The trial court found that the State provided race-neutral reasons for its strikes of panel members 7, 9, 14, and 31 and denied appellant's *Batson* challenge. On appeal, appellant argues that the trial court's finding of race-neutral reasons for the State's strikes was clearly erroneous.[3]

At the onset, we note that the State used a statistically disproportionate number of strikes on black members of the panel. As mentioned above, 14.29% of the panel within the strike zone were black. However, the State used 36.36% of its strikes on black panel members. A statistically disproportionate number of the State's strikes were used against black veniremembers. "The disproportionate use of strikes would obviously serve to establish a prima facia case," but because the prosecutor provided a race-neutral explanation, the inquiry whether the defendant has made a prima facie case is moot. *Watkins*, 245 S.W.3d at 452; *see Moore*, 265 S.W.3d at 78. Beyond establishing a prima facie case, the disproportionality in the use of strikes may also "support the appellant's ultimate burden of persuasion that the State's proffered race-neutral explanations are a sham." *Watkins*, 245

S.W.3d at 452. But, as the United States Supreme Court in *Miller–El* notes, a comparative analysis is "more powerful" than "bare statistics," and thus, we consider the reasons offered by the prosecutor to explain each strike. *See Miller–El*, 545 U.S. at 241, 125 S.Ct. at 2325.

### 1. Veniremembers Wiggins and Fontenot

■ Wiggins (veniremember 7) and Fontenot (veniremember 31) were both black women employed by the USPS. At the *Batson* hearing, the prosecutor testified that he struck Wiggins and Fontenot because of their employment with the USPS. The prosecutor also stated that veniremember 31 originally indicated that she would not consider assessing a life sentence.

■ "[W]hen the State indicates that it challenged a prospective juror based on that person's type of employment and that the State has had poor success with that type of worker, the reason is a race-neutral explanation for exercising the peremptory challenge." *Moore*, 265 S.W.3d at 84 (holding that striking postal worker on basis of occupation was race-neutral); *see Tompkins v. State*, 774 S.W.2d 195, 205 (Tex.Crim.App.1987), *aff'd*, 490 U.S. 754, 109 S.Ct. 2180, 104 L.Ed.2d 834 (1989) (also holding strike based on employment with postal service was race-neutral). A strike based on a persons's type of employment is deemed to be genuine so long as other people with the same occupation are also struck. *Moore*, 265 S.W.3d at 84.

Here, the prosecutor explained that he struck panel members 7 and 31 because they were both employed by the USPS. The prosecutor pointed out that panel

---

**3.** We note that appellant's briefing on the *Batson* issue is surprisingly general and cursory and contains misstatements of the record. However, given the important nature of

the constitutional rights involved in this appeal, we construe our briefing rules liberally and will address the full merits of this issue. *See* TEX.R.APP. P. 38.9.

members 3 and 42 were non-black panel members also employed by USPS, but those individuals were removed for cause prior to the exercise of peremptory strikes. Thus, all persons on the venire employed by USPS were removed, either for cause or by the prosecutor's use of peremptory strikes.

Appellant's trial counsel did not cross-examine the prosecutor on his explanation but simply responded by arguing that there "is no merit in castigating the entire United States Postal Service and using that as a weapon to strike anybody that ever worked for the postal service. It just so happens all these employees were black." However, the simple fact that the postal employees were black is not sufficient to satisfy appellant's burden under *Batson. See Tompkins*, 774 S.W.2d at 205; *Young*, 283 S.W.3d at 866. Because appellant has pointed to no evidence, such as disparate treatment of postal workers of different races that would rebut the State's race-neutral explanation, we will not disturb the trial court's finding that the State's explanation was sufficient. Accordingly, we cannot conclude that the trial court clearly erred in accepting the State's race-neutral explanation with respect to the strike of Wiggins and Fontenot, or that Wiggins and Fontenot were treated disparately from other panel members.

### 2. Veniremember King

 King, veniremember 14, indicated during the prosecutor's questioning that she had visited a loved one in prison who had been convicted of a felony. The prosecutor stated that he struck King because of this response, along with all other panel members who answered similarly. Courts have held that having family or loved ones arrested, convicted, or in prison is a race-neutral reason for striking a panel member. *Simpson v. State*, 119 S.W.3d 262,

267–68 (Tex.Crim.App.2003); *Earhart v. State*, 823 S.W.2d 607 (Tex.Crim.App. 1991).

The record reflects that four other panel members (numbers 16, 37, 39, and 53) provided a similar response. The prosecutor successfully challenged panel member 39 for cause and struck panel members 16, 37, and 53. The record shows that the prosecutor's treatment of veniremembers who had visited loved ones in prison was uniform.

Counsel for appellant offered no response to the prosecutor's stated reason for striking King. Because the record supports the prosecutor's statement that he uniformly struck all persons within the strike zone who provided a similar response to King, we cannot conclude that the trial court clearly erred in denying appellant's *Batson* challenge with respect to King or that King was treated disparately.

### 3. Veniremember Robertson

 Robertson, veniremember 9, was a black man who initially indicated that he could not consider a life sentence for an aggravated robbery. The prosecutor explained that he struck Robertson for this reason. Unwillingness to consider the full range of punishment is a race-neutral reason for striking a panel member. *Watkins*, 245 S.W.3d at 451.

Appellant's trial counsel responded by arguing that the prosecutor's explanation was not genuine and was a pretext because he "did not strike [panel members] 33, 41, 52, and 57, none of which are black and all of which initially said they could not consider a life sentence." In other words, appellant contends that the prosecutor treated Robertson differently than other veniremembers who gave similar initial answers because of his race. Accordingly, we move to a comparative analysis to de-

termine if the State's race-neutral explanation was merely a pretext. *Id.*

### a) Comparative Analysis

During the State's voir dire examination, the prosecutor explained that the range of punishment for aggravated robbery was "15 years to life" and asked panel members if they would be able to consider life imprisonment. The State posed the question by calling the number of each panel member, allowing each to respond "yes" or "no." At trial, appellant contended that panel members 33, 41, 52, and 57 provided a response similar to Robertson's, indicating that they could not consider a punishment of life imprisonment.

### i) Robertson and Veniremember 57

Contrary to appellant's argument, the record reflects that, unlike Robertson, veniremember 57 answered, "Yes," indicating that she *could* consider a life sentence. Thus, appellant was incorrect in asserting that panel member 57 gave a response similar to Robertson's, and we need not consider panel member 57 in our comparative analysis.

### ii) Robertson and Veniremember 41

■ Similarly, the record reflects that veniremember 41's answer to the prosecutor's question was significantly different from Robertson's answer. Unlike Robertson's categorical answer of "no," veniremember 41's answer was conditioned on the availability of parole in this case. The record shows the following exchange occurred when the prosecutor reached panel member 41:

[Prosecutor]: 41?

[Veniremember 41]: Can you clarify, with or without parole?

[Prosecutor]: I can't get into—the Judge is going to advise you that we can't talk about that.

[Veniremember 41]: Then no.

From this exchange, it can be reasonably inferred that veniremember 41's answer hinged on whether the sentence would be life imprisonment with the possibility of parole. The jury charge did, in fact, include an instruction on parole and how it was to be considered by the jury in this case.[4] Knowing that a life sentence here would be imposed with the possibility

---

4. The jury charge in the punishment phase included the following instructions:

Under the law applicable in this case, the defendant, if sentenced to a term of imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts at rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.

It is also possible that the length of time for which the defendant will be imprisoned might be reduced by the award of parole. Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served equals one-half of the sentence imposed or thirty years, whichever is less, without consideration of any good conduct time he may earn. Eligibility for parole does not guarantee that parole will be granted.

It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities.

You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant.

of parole, the prosecutor could have reasonably determined that veniremember 41, if selected for the jury, would be able to consider a life sentence after receiving the instruction regarding consideration of parole in assessing punishment. Because veniremember 41 answered differently from Robertson, it would also be reasonable that the prosecutor would not find veniremember 41 objectionable to the same degree as Robertson and choose not to exercise a peremptory strike on veniremember 41. *See Johnson v. State*, 959 S.W.2d 284, 292 (Tex.App.-Dallas 1997, pet. ref'd) ("[P]rospective jurors may share a negative feature, but that feature may be outweighed by characteristics that are favorable from the State's perspective. Such distinctions may properly cause the State to challenge one potential juror and not another."); *see also Cantu*, 842 S.W.2d at 689 (observing that the decision to strike a particular venireperson "is a fluid process, often hinging on the interaction of a number of variables and permutations" and it "is unlikely that two venirepersons on one panel will possess the same objectionable attribute or character trait in precisely the same degree"). Under these circumstances we conclude that the prosecutor's failure to strike veniremember 41 does not raise an inference of disparate treatment. *Id.*

### iii) Robertson and Veniremember 52

■ The record as a whole shows that the responses given by veniremember 52 on the issue are not sufficiently similar to the response given by Robertson to raise an inference of disparate treatment.

When the prosecutor first posed the question to the panel, the initial responses of Robertson and veniremember 52 were the same; they both answered "No" (indicating that they could not assess a life sentence as punishment). However, both later changed their answer.

During the defense's examination, appellant's attorney attempted to rehabilitate those panel members who indicated they could not consider a life sentence by describing particularly "gruesome" facts and globally asking by row who "could never consider a life sentence for an aggravated robbery case, no matter how gruesome the facts?" Only four panel members (numbers 2, 39, 42, and 48) raised their hands and indicated that they wished to maintain their previous response and still would not consider a life sentence. Most of those who, during the State's voir dire examination, originally indicated that they could not consider a life sentence were rehabilitated by remaining silent and not affirmatively stating that they wished to keep their previous response. However, unlike Robertson and the other veniremembers, the record reflects that veniremember 52 was rehabilitated by raising her hand and affirmatively stating that she wished to change her answer. The record reflects the following exchange during the defense's voir dire examination:

[Defense Counsel]: But you are still sticking to [your previous response]—your number is?

[Veniremember 52]: 52

[Defense Counsel]: You are still sticking to your position?

[Veniremember 52]: I'm 52, and I'm changing my answer to yes.

Additionally, the record reflects that panel member 52 was called up to the bench individually:

[The Court]: Earlier when they were asking you a question, you said you couldn't give life in a case. I think that you eventually changed that. Did you stick to that, or did you change it?

[Veniremember 52]: I changed it. I can.

The issue of the ability of a potential juror to assess punishment was an important issue to both the defense and prosecution. Because the manner in which veniremember 52 affirmatively changed her initial response was significantly different from how Robertson was rehabilitated, it would be reasonable that the prosecutor would not find veniremember 52 objectionable to the same degree as Robertson. *See Cantu*, 842 S.W.2d at 689 (observing that veniremembers often possess negative attributes to varying degrees and such distinctions may properly cause the State to challenge one juror and not another). In other words, it was not unreasonable for the prosecutor to conclude that veniremember 52 was more certain and sincere in her subsequent change of answer than Robertson. Viewing the entire record as a whole, we cannot conclude that the prosecutor's failure to strike veniremember 52 raises an inference of Robertson's disparate treatment because of race and that the prosecutor's explanation for striking Robertson was a pretext.

### iv) Robertson and Veniremember 33

 Finally, we consider veniremember 33. Both veniremember 33 and Robertson provided the same answer to the prosecutor's question regarding a potential life sentence and both were passively rehabilitated on this issue by appellant's trial attorney. However, a review of the entire record supports the conclusion that the prosecutor's failure to strike veniremember 33 for the same reason as Robertson was the result of a mistake in his notes and not evidence of his disparate treatment of Robertson based on race.

Here, in response to the challenge by appellant's trial counsel, the prosecutor represented to the trial court that he exercised a peremptory strike on all veniremembers who he had marked in his notes as stating that they could not consider life imprisonment and that he did not strike veniremember 33 because she was not marked in his notes as having given this response. Appellant's counsel did not cross examine the prosecutor on this statement or request the production of the prosecutor's notes to assess the truth of the statement. *See Pondexter v. State*, 942 S.W.2d 577, 582 (Tex.Crim.App.1996) (holding that appellant is entitled to prosecutor's voir dire notes if they were actually used by prosecutor to refresh his memory); *Salazar v. State*, 795 S.W.2d 187, 193 (Tex.Crim.App.1990) (holding that production of a prosecutor's juror information notes is both "necessary and proper" when prosecutor refreshes his memory regarding the exercise of peremptory challenges by reviewing those notes before giving testimony at *Batson* hearing). Nor has appellant's counsel presented evidence from the record that would create an inference that the prosecutor made the mistake in his notes and/or misrepresented to the court the contents of his notes for the purpose of concealing the alleged disparate treatment of Robertson because of his race. For example, here, there is no evidence in record that the prosecutor (1) made statements during voir dire or trial indicating that race played any factor in his strikes, (2) did not direct any questions to black veniremembers before attempting to strike them, or (3) attempted a jury shuffle to remove black jurors from the strike zone.[5] *See, e.g., Moore*, 265 S.W.3d

5. In *Moore*, responding to a *Batson* challenge, the prosecutor stated that her reason for striking a black panel member was because she

was "an 'older' female with no children" and explained she wanted jurors with children because they were familiar with the difficul-

at 89; *see also Miller–El*, 545 U.S. at 233, 125 S.Ct. at 2320–21 (court considered State's use of jury shuffle to rearrange panel members when a number of black members were seated at front as indicative of a broader pattern of discrimination, and ultimately found that State's strikes against blacks were also racially motivated).[6] Significantly, the prosecutor's conduct in exercising his peremptory strikes was consistent with his representation to the trial court that he used his strikes in an attempt to remove all veniremembers who, like Robertson, initially indicated that they could not consider life. *See Watkins*, 245 S.W.3d at 453 (holding that, reviewing record in its entirety, prosecutor's race-neutral reason was not a pretext where State applied this reason to strike black veniremember and *most* but not all similarly situated non-black veniremembers) (emphasis added). Specifically, of those veniremembers who initially indicated they would not consider life imprisonment, eight were removed for cause and eight others were methodically stricken by the State.[7] In sum, reviewing the entire record regarding non-black veniremembers who, like Robertson, initially responded that they could not give a life sentence in

this case, we find that most were removed for cause or struck by the State, and those who were not struck have differences far more significant than any similarity to Robertson. Accordingly, we conclude that the prosecutor's race-neutral explanation for striking Robertson can be reasonably accepted, and it was not a pretext. *See Miller–El*, 545 U.S. at 247, 125 S.Ct. at 2329 (credibility of reasons given can be measured by "how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy").

We cannot conclude that the trial court clearly erred in denying appellant's *Batson* challenge to the State's use of peremptory strikes on panel members 7, 9, 14, and 31. *See Moore*, 265 S.W.3d at 78 (defining "clearly erroneous" as requiring "a definite and firm conviction that a mistake has been committed"). Accordingly, we overrule appellant's second issue.

### III. Mother's Testimony

In his third issue, appellant contends that the trial court erred by refusing to allow his mother to testify that appellant is "mentally retarded" during the punishment phase of trial.

---

ties in dealing with children. 265 S.W.3d at 87. The prosecutor represented to the trial court that, consistent with her trial strategy, she also struck a non-black female panel member without children. *Id.* However, this statement was not true. The record revealed that the prosecutor did not strike that individual; that panel member had been struck by appellant. *Id.* at 88.

In reviewing the record as a whole, we found evidence in *Moore* that would support the inference that the prosecutor's statement to the court was not a good faith error but rather an attempt to justify the unlawful disparate treatment of a black veniremember. Specifically, the prosecutor in *Moore* explained that her strike "was not *just* based on ... skin color," indicating the prosecutor did not eliminate skin color from her consider-

ation. *Id.* (emphasis added). We also noted that the State did not direct any questions to the black panel member, and further questioning of the panelist might have yielded more information. *Id.* at 89. Under these circumstances we found that the prosecutor engaged in the unlawful discrimination of black veniremembers because of race. In the present case, a review of the record does not reveal such similar evidence.

**6.** We note that, in this case, four of the five black veniremembers were seated in the first row of the panel.

**7.** The record reveals that veniremembers 2, 10, 11, 32, 38, 39, 42, and 48 were removed for cause, and the State struck veniremembers 6, 9, 14, 23, 27, 31, 37, and 53.

## A. The Record

During the punishment phase, while appellant's mother was on the stand, the following exchange occurred:

[Defense counsel]: And how was he doing in school?

[Witness]: He wasn't doing well.

[Defense counsel]: Why not?

[Witness]: Because [appellant] is mentally retarded, and he got—

[Prosecutor]: Objection, Your Honor. Hearsay.

[The Court]: Sustained.

[Defense counsel]: Can I make a bill on that, Judge?

[The Court]: Sure.

The parties approached the bench. At the bench, the following exchange occurred:

[The Court]: Mental retardation has a specific definition. It has specific proof. Do you have some kind of proof other than this lady's testimony that she believes her son to be retarded?

[Defense counsel]: I do but I'm not planning to go into it, and I'm not planning to ask her if somebody told her. I'm asking her her opinion.

[The Court]: How would she know?

[Defense counsel]: I think a parent knows if their child is slow or mentally retarded.

[The Court]: Mentally retarded is a legal term. If you can establish that she—I'm giving you your bill. If you can establish she knows the definition and she has seen the testing, certainly a parent can testify to that if they know the required information. The term [sic] "slow" and "mentally retarded" aren't equal. And then and about the brother—

[Defense counsel]: I probably would have phrased it as "slow" rather than "mentally retarded" if I had asked a leading question on that, but she chose the word "mentally retarded."

[The Court]: That's the reason that I—

[Defense counsel]: I'm not arguing with your ruling. I will never argue with your ruling.

[The Court]: I understand. If you want to follow it up with a question as opposed to a bill, but if you want to do a bill right now to prove up she can testify as to mental retardation, that's fine.

Appellant's counsel then conducted a voir dire examination of appellant's mother:

[Defense counsel]: And what would cause you to say [appellant] was mentally retarded?

[Witness]: Because he was diagnosed with that when he was in school for ADHD. And when he was taken into CPS custody, he been [sic] through a lot of psychiatrists since the age of 7 until the age of 17. And I've got proof and a package of his medical history of his mental illness. He's slow. He's got dyslexia.

[Defense counsel]: Judge, I wasn't planning to offer any of the written documents. I was just going to offer her impressions, and I wasn't even going into what all the diagnosis was and who diagnosed and all that kind of stuff. Basically from my perspective, I want to prove up from his mother's standpoint he was slow in school.

The trial court permitted appellant's mother to testify as follows:

[Defense counsel]: My question that I'm asking you about now is confined to when [appellant] was about 7, and I'm asking you your opinion as to his mental abilities, not a legal opinion and not what somebody else may have told you, not any records, just what you observed

as his mother. How was he doing mentally at the age of 7?

[Witness]: [Appellant] wasn't functioning normal like a regular child.

[Defense counsel]: And what do you mean by that? And I'm talking about school work.

[Witness]: He—well, he read [sic] his words—the way he see [sic] his words—the way we see our words before us, his words is [sic] backwards.

[Defense counsel]: And how was he doing in school grade-wise?

[Witness]: He wasn't doing good [sic] at all. He was in special education classes.

[Defense counsel]: And how would you characterize, without using legal words, his mental abilities? Sharp, normal, slow? What would you say?

[Witness]: Slow.

### B. The Law

Appellant contends on appeal that, under Rule 701 of the Texas Rules of Evidence, the trial court should have allowed appellant's mother to testify that appellant is mentally retarded. However, the issue was not properly preserved for appellate review. *See* Tex.R.App. P. 33.1.

Texas Rule of Appellate Procedure 33.1 requires, as a prerequisite to presenting an issue for appellate review, that the record show that the appellant brought the issue before the trial court by timely request, objection, or motion, that stated the grounds with sufficient specificity to make the trial court aware of the complaint. *See id.*

### C. Analysis

▇ Appellant did not explain to the trial court why his mother should have been allowed to testify that he was mentally retarded under any rule of evidence, let alone Rule 701. On the contrary, counsel for appellant stated that he was "not arguing with [the trial court's] ruling" and that the witness, rather than the attorney, "chose the word 'mentally retarded.'" Counsel for appellant further informed the trial court that he only wanted to establish "from [appellant's] mother's standpoint" that "[appellant] was slow in school." The trial court allowed appellant's mother to provide that testimony.

Under these circumstances, we conclude that appellant failed to preserve the issue for appellate review. *See* Tex.R.App. P. 33.1. We overrule appellant's third issue.

### Conclusion

We affirm the judgment of the trial court.