COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                       NO. 02-09-00039-CR

 

 

STANLEY DEWAYNE WILSON                                                          APPELLANT

 

                                                             V.

 

THE STATE OF TEXAS                                                                             STATE

 

                                                       ------------

 

              FROM
THE 213TH DISTRICT COURT OF TARRANT COUNTY

 

                                                       ------------

 

                                      MEMORANDUM OPINION[1]

 

                                                       ------------

I.  Introduction

In five points,
Appellant Stanley Dewayne Wilson appeals his conviction for aggravated robbery
with a deadly weapon.  We affirm.

 

 








II.  Factual and
Procedural History

Wilson pleaded not
guilty to aggravated robbery with a deadly weapon, and a jury found him guilty
and assessed his punishment at ninety-nine years= confinement.  In addition to his complaints about the trial
court=s admission of
extraneous offense evidence and its denial of his Batson challenge
during voir dire,[2]
Wilson complains that the evidence is legally and factually insufficient to
support his conviction.  Therefore, we
will discuss the facts in greater detail below.

III.  Sufficiency of
the Evidence

In his first two
points, Wilson complains that the evidence is legally and factually
insufficient to support his conviction for aggravated robbery with a deadly
weapon.  However, we will review the
evidence only under the legal sufficiency standard because the court of
criminal appeals has recently overruled Clewis v. State, 922 S.W.2d 126
(Tex. Crim. App. 1996) (setting out the factual sufficiency standard of review)
and decided Athat the Jackson v. Virginia legal‑sufficiency
standard is the only standard that a reviewing court should apply in
determining whether the evidence is sufficient to support each element of a
criminal offense that the State is required to prove beyond a reasonable doubt.@  Brooks v. State, No. PD‑0210‑09,
2010 WL 3894613, at *1, 14 (Tex. Crim. App. Oct. 6, 2010).

   








A. 
Standard of Review

In reviewing the
legal sufficiency of the evidence to support a conviction, we view all of the
evidence in the light most favorable to the prosecution in order to determine
whether any rational trier of fact could have found the essential elements of
the crime beyond a reasonable doubt.  Jackson
v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Clayton v.
State, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

B. 
Aggravated Robbery with a Deadly Weapon

A person commits
aggravated robbery if, in the course of committing theft and with intent to
obtain or maintain control of the property, he intentionally or knowingly
threatens or places another in fear of imminent bodily injury or death and uses
or exhibits a deadly weapon.  See
Tex. Penal Code Ann. ' 29.03(a)(2) (Vernon 2003). A person
commits theft if he unlawfully appropriates property with intent to deprive the
owner of the property.  Id. ' 31.03(a)
(Vernon 2003).  An appropriation of
property is unlawful if it is without the owner=s effective
consent.  Id. ' 31.03(b)(1).

C. 
Evidence

1.  First RobberyCSandro Reyes








Dawn Fuller stated
that on the night in questionCApril 29, 2005Cshe lived at
Cypress Club Apartments in Arlington, in a second-story apartment that
overlooked the parking lot.  She stated
that she heard raised voices in the parking lot in the early morning.  She looked outside, saw Wilson[3]
and her neighbor Sandro Reyes, heard a Apop
and . . . an ugh sound,@ and then saw
Reyes hit the ground.[4]  She watched as Wilson rifled through Reyes=s pockets and took
Reyes=s keys.  He then used the keys to take Reyes=s truck, but he
backed it into a culvert.  She continued
to watch as Wilson emerged from the truck and ran away up the culvert.  She described Wilson as follows:  ASlim build, black
guy, low haircut.@ 
She also stated that he was wearing A[d]ark bottoms
[and a] long white tank top@ that evening.

While outside with
the police, Fuller heard a couple of gunshots coming from the right, to the
northeast of the apartment complex.

2.  Second RobberyCScott Stewart

On April 29, 2005,
Scott Stewart lived at 1701 Monaco Drive in Arlington. Larea Buckley and
Stewart were outside on his porch around 1:00 a.m. when they heard a loud bang
like a gunshot, followed by some sirens a few minutes later. Shortly
thereafter, Buckley started home.  She
had barely driven past five houses when Wilson flagged her down.  He was in the middle of the road, waving his
arms frantically.








When Buckley
slowed down, Wilson ran up to her window and asked her for a ride.  Although she could not see him very well, she
let him in.  She saw Wilson more clearly
when the car=s interior lights came on and realized
that she Amade a major mistake.@  Sweat poured down his face, and he kept
looking around frantically like someone was after him.[5]  Her description of Wilson=s attire matched
Fuller=s above:  a white Awife-beater@ tank top-style
T-shirt and blue jeans.

Buckley turned the
car around and headed back to Stewart=s house.  When they arrived there, she told Wilson that
she wanted her friend to do the driving. 
She stayed in the running car while she waited for Stewart.  Stewart saw them from his bedroom window and
made his way outside to the driveway. 
She told him that Wilson needed a ride. 
Stewart spoke with Wilson from the outside of the vehicle through the
driver=s side window, and
Wilson told him that he needed to get to Dallas.  Stewart replied that they would not take him
to Dallas or give him a ride.








Wilson stepped out
of the car and looked like he was going to walk away, but after a few steps, he
returned to the driver=s side of the vehicle, where Buckley and
Stewart were standing.  Buckley testified
that Wilson begged and pleaded with them for a ride, and he lunged towards the
driver=s side of the car
more than once, trying to jump into the vehicle.  Stewart barred Wilson=s way and told
Buckley to get in the house and call the police.  Stewart testified that Wilson confronted him
with a drawn gun and opened fire.

Buckley testified
that when she turned around before going inside the house to call the police,
she saw Wilson draw a silver handgun and fire the first shot into Stewart.  She stated that she thought that, since they
were not going to give Wilson a ride, he was going to take her car Ato get out of
there.@  Stewart testified that he thought he might
die when Wilson started firingCWilson was only
four feet away when he started shootingCand, based on
Wilson=s demeanor and
actions, he thought Wilson was trying to take the car.  Wilson shot Stewart a total of five times
while Buckley called the police.[6]

Stewart=s wounds were
inflicted as he tried to take a defensive posture and go for the gun.  When the shooting stopped, he kicked the gun
out of Wilson=s hand and tackled Wilson.  He testified that he remembers hitting the
ground, that he blacked out Aa little bit,@ and that when he
regained consciousness, Wilson was running away.  Stewart acknowledged on cross-examination
that it would have been pretty easy for someone to take the car once he was
down.  But he also replied, Ayes,@ when asked
whether he was Aable to position [him]self in such a way
that the car was never entered[.]@








After Wilson ran
off, Stewart calmly walked to the top of the driveway and sat down AIndian Style@ to wait for an
ambulance.  When Buckley came back
outside, there was blood everywhere. 
Buckley testified that she still finds blood from the shooting inside
her car. 

3.  Police Investigation

Arlington Police
Detective Brett Worman testified that he was a patrol officer in April 2005 and
was dispatched to the Cypress Club Apartments at 1:39 a.m. when the shooting
was reported.  When he arrived, he saw a
truck backed into a drainage culvert on the north side of the apartment
complex.  He and the other attending
officers cleared that vehicle first to make sure the suspect was not still
there, then attended to Reyes, who was laying on his back in the parking lot
with a gunshot wound. 








At 1:52 a.m.Cthirteen minutes
after his initial dispatch to the Cypress Club ApartmentsCDetective Worman
was dispatched to a shooting-in-progress call at 1701 Monaco Drive.  He testified that, running police lights and
sirens, it takes thirty to forty-five seconds to get from the Cypress Club
Apartments to Stewart=s house and that they are approximately
half a mile apart.  When he arrived, he
found Stewart sitting AIndian-style@ at the top of the
driveway, and he could not tell how many times Stewart had been shot because of
the amount of blood.  Stewart told him
that he had been shot by a black male. 
Detective Worman applied pressure to Stewart=s wounds until the
paramedics arrived a few minutes later, and then he roped off the crime scene.

Elizabeth
Rosenhaur and Peter Salicco, who were both Arlington Police Department crime
scene investigators at the time, also testified at trial.  They arrived separately at the Cypress Club
Apartments around 2 a.m.; Reyes was already dead. Salicco went on to the Monaco
Drive crime scene.  Rosenhaur
photographed the Cypress Club crime scene, collected blood that had spilled
near where Reyes=s body was found, and collected fingerprints
from the truck in the culvert.  When
asked whether it appeared to her that someone could drive the truck out of the
culvert, Rosenhaur said no.

Salicco
photographed the Monaco Drive crime scene and fingerprinted Buckley=s vehicle.  He stated that there was a lot of blood at
the scene and that, based on the amount of Stewart=s blood loss, he
was surprised Stewart survived.  He
stated that he photographed blood on the inside of Buckley=s vehicle on the
driver=s side and that
the explanation for that was either the window was down, or the door open, at
the time of the shooting.  There was also
blood on the exterior side of the door and blood spatter on the ground next to
the driver=s side of the vehicle. Blood had pooled at
the top of the driveway.  He found bullet
fragments at the scene, and a bloody t-shirt was collected in the yard of 2010
Monaco Drive, just down the street from the crime scene.








Salicco, a latent
print examiner, performed the physical examination on the fingerprints that he
and Rosenhaur had collected at the two crime scenes after they were run through
the Automated Fingerprint Identification System (AFIS).  He testified that the fingerprints that he
lifted from the outside of the passenger side door matched Wilson=s, as did the
fingerprints that Rosenhaur collected from the exterior driver=s side door of
Reyes=s pickup, and that
no two people in the world have the same fingerprints. 

Four days later,
Dallas Police Officer Christopher Lewis arrested Wilson at a Dallas apartment
complex.  Wilson=s sister answered
the door and gave police permission to search the apartment.  They found Wilson hiding in a hall closet.
Officer Lewis described Wilson=s demeanor as Akind of
defeated.  I mean, he . . . he just knew
that he had been caught and that was it.@

Arlington Police
Detective Ben Lopez, the lead detective on the case, testified that he took
buccal swaps of both Wilson and Stewart. 
Constance Patton, senior forensic biologist and DNA technical leader for
the Tarrant County Medical Examiner=s Officer crime
laboratory, testified that she tested the bloody t-shirt found on Monaco Drive
and Wilson=s shoes and pants that he was wearing when
he was arrested.  The presumptive test
for blood that she performed on the shoes indicated that blood was present, and
the stain on the left shoe had male DNA from at least two individuals.  Wilson and Stewart could not be excluded from
the .001% of the population who could have contributed that DNA.








Patton tested two
different areas on the t-shirt:  the neck
and one of the blood stains on the front. 
From the neck sample, she stated that neither Wilson nor Stewart could
be excludedCthey fell within the 0.6% of the
population that had the types possible to contribute to the mixtureCbut that there
were some other Atypes@ that were also
detected that could not have originated with either one.  Therefore, she was unable, on the probability
of exclusion, to say with any certainty whose T-shirt it was.  The bloodstain found on the shirt belonged to
Stewart.  

Patton testified
that, as to the pants, one of the stains tested positive for blood, but it met
a partial profile of Wilson and excluded both Stewart and Reyes.  Another stain was a mixture, but most of it
was from a male matching Stewart=s DNA profile. 

D. 
Analysis

Wilson was charged
with intentionally or knowingly, while in the course of committing theft of
property and with intent to obtain or maintain control of said property,
threatening or placing Scott Stewart in fear of imminent bodily injury or death
on or about April 29, 2005, while using or exhibiting a deadly weapon
(firearm).  Wilson concedes that there is
sufficient evidence to show that he committed aggravated assault, and based on
the facts above, we agree. 

Wilson specifically
challenges the evidence to support the Ain the course of
committing theft of property and with the intent to maintain control of the
property@ aggravated
robbery element, arguing that A[t]here were
plenty of opportunities for the vehicle to have been stolen[,] [b]ut it did not
happen.@








We must review
circumstantial evidence of intent with the same scrutiny as other elements of
an offense.  Laster v. State, 275
S.W.3d 512, 519B21 (Tex. Crim. App. 2009) (overruling Margraves
v. State, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000)).  

Both Buckley and
Stewart testified that they believed Wilson intended to steal Buckley=s car, and their
testimonies about his actionsCsuch as lunging
towards the driver=s seat multiple times and his insistence
on getting a ride to DallasCviewed in the
light most favorable to the prosecutionCsupport the
conclusion that a rational trier of fact could have found the essential
elements of theft necessary for Wilson=s aggravated
robbery with a deadly weapon conviction. 
See Jackson, 443 U.S. at 319, 99 S. Ct. at 2789; Clayton,
235 S.W.3d at 778. 

Furthermore,
although Wilson argues that there were numerous opportunities for him to have
stolen the vehicle, including after Stewart had been shot and was on the
ground, the jury could have still concluded that Wilson intended to steal the
vehicle.  That is, until Buckley and
Stewart refused to give in to his pleading for a ride back to Dallas, Wilson
had no need to draw the gun and to attempt to take the vehicle by force.  And Stewart also testified that he was able
to position himself in such a way that Wilson never entered the vehicle. 








Based on Buckley=s and Stewart=s testimonies, as
well as Fuller=s testimony about seeing Wilson search
Reyes=s pockets and take
Reyes=s keys after
shooting him and before taking Reyes=s vehicle, and the
corroborating testimony about Wilson=s fingerprints on
Reyes=s vehicleCdemonstrating that
Wilson had already committed one theft of a vehicle that evening[7]Cwe conclude that
the evidence is legally sufficient to support the theft element of Wilson=s aggravated
robbery with a deadly weapon conviction, and we overrule his second point.

IV.  Extraneous
Offense Evidence 

In his third and
fourth points, Wilson argues that the trial court erred when it overruled his
objection to the admission of the extraneous capital murder offense and when it
ruled that the probative value of this extraneous offense evidence was not
outweighed by its prejudicial effect.

A.  Standard
of Review

The admissibility
of evidence is within the trial court=s discretion and
will not be overturned absent an abuse of discretion.  Moses v. State, 105 S.W.3d 622, 627
(Tex. Crim. App. 2003).  So long as the
trial court=s ruling lies within the zone of
reasonable disagreement, the appellate court should affirm.  Id.

 

 

 








B. 
Analysis

Wilson objected
before each witness=s testimony about the Reyes shooting,[8]
principally citing evidence rules 403, 404(a)(1), and 404(b), the rules now
argued before us.  The trial court
overruled each objection, finding that the evidence was Asame transaction
contextual evidence.@

ASame transaction
contextual evidence@ is evidence reflecting the context in
which a criminal act occurred.  Wesbrook
v. State, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000), cert. denied,
532 U.S. 944 (2001).  It is a recognition
that events do not occur in a vacuum, and a jury has a right to hear what
occurred immediately before and after the offense in order to realistically
evaluate the evidence.  Id.  Extraneous offenses may be admissible as same
transaction contextual evidence when several crimes are intermixed, or blended
with one another, or connected so that they form an indivisible criminal
transaction.  Prible v. State, 175
S.W.3d 724, 731B32 (Tex. Crim. App.), cert. denied,
546 U.S. 962 (2005).  This type of
evidence results when an extraneous matter is so intertwined with the State=s proof of the
charged offense that avoiding reference to it would make the State=s case incomplete
or difficult to understand.  Id.
at 732.

Evidence rule 404
states,








(a)
Character Evidence Generally.  Evidence
of a person=s character or character trait is
not admissible for the purpose of proving action in conformity therewith on a
particular occasion, except:

 

(1)
Character of accused.  Evidence of a
pertinent character trait offered:

 

(A)
by an accused in a criminal case, or by the prosecution to rebut the same . . .


 

 . . . 

 

(b)
Other Crimes, Wrongs or Acts.  Evidence
of other crimes, wrongs or acts is not admissible to prove the character of the
person in order to show action in conformity therewith.  It may, however, be admissible for other
purposes, such as proof of motive, opportunity, intent, preparation, plan,
knowledge, identity, or absence of mistake or accident, provided that upon
timely request by the accused in a criminal case, reasonable notice is given in
advance of trial of intent to introduce in the State=s case-in-chief such evidence other
than that arising in the same transaction.

 

Tex. R. Evid. 404(a)(1), (b). 

Wilson argues that
the two offenses were not indivisibly connected because they were at two
separate locations and because the Reyes murder was not necessary to the State
proving the Stewart robbery.  He further
contends that Reyes=s death did not occur immediately prior to
the robbery and shooting.  We disagree.








The crime scenes
were close enough for Buckley and Stewart to hear the gunshot that killed Reyes
and for Fuller to hear the gunshots that Wilson fired into Stewart.  Less than thirteen minutes after police
arrived at the Reyes murder scene and around half a mile away, Buckley
encountered a sweating and frantic Wilson looking to get back to Dallas.  Until she and Stewart refused to give Wilson
a ride in her vehicle, Wilson did not try to jump into the driver=s side of Buckley=s vehicle or draw
his weapon and fire on Stewart.  This
evidence had little to do with the character of someone likely to steal a
vehicle and actions in conformity therewith. 
Cf. Tex. R. Evid. 404(a)(1), (b). 
Rather, to the extent that it might otherwise not be same transaction
contextual evidence of Wilson=s
shooting-and-vehicle-stealing crime spree on April 29, 2005, evidence of Reyes=s shooting and the
other evidence collected at the crime scene pertaining to the shooting (such as
the truck in the culvert) demonstrated Wilson=s motive, intent,
and identity with regard to the Stewart aggravated robbery.  See Tex. R. Evid. 404(b); Prible,
175 S.W.3d at 731B32. 
Therefore, we conclude that the trial court did not abuse its discretion
by allowing this testimony.








Furthermore, under
Texas Rule of Evidence 403, although otherwise relevant evidence may be
excluded if its probative value is substantially outweighed by the danger of
unfair prejudice, we do not believe the trial court abused its discretion by
allowing the State to present this evidence. 
See Tex. R. Evid. 403. 
Considering the evidence=s probative value
against its potential to impress the jury in some irrational, indelible way,
the time taken to develop the evidence, and the State=s need for it, we
cannot say on these facts that the trial court abused its discretion becauseCas stated aboveCthe State needed this
evidence to demonstrate Wilson=s intent to steal
a second vehicle within thirteen minutes after his first attempt ended with an
immovable truck in a drainage culvert.  See
Erazo v. State, 144 S.W.3d 487, 489 (Tex. Crim. App. 2004).  Although Wilson killed Reyes, we do not think
this fact would inflame the jury any more than Stewart=s testimony about
being shot five times at close range by Wilson, particularly in light of Stewart=s descriptions of
his wounds and the photographs of them that were presented to the jury.  See id.  And although a trial court must still perform
a balancing test to see if same transaction contextual evidence=s probative value
is substantially outweighed by its prejudicial effect, the prejudicial nature
of contextual evidence rarely renders such evidence inadmissible, as long as it
sets the stage for the jury=s comprehension of
the whole criminal transaction, as it did here. 
See Swarb v. State, 125 S.W.3d 672, 681 (Tex. App.CHouston [1st
Dist.] 2003, pet. dism=d). 
Therefore, we overrule Wilson=s third and fourth
points.

V.  Batson Challenge

In his fifth
point, Wilson contends that the trial court erred when it overruled his Batson
objection at the conclusion of voir dire.

A. 
Standard of Review








A defendant
objecting under Batson must make a prima facie showing of racial
discrimination in the State=s exercise of its
peremptory strikes.  Williams v. State,
301 S.W.3d 675, 688 (Tex. Crim. App. 2009), cert. denied, 130 S. Ct.
3411 (2010).  The burden then shifts to
the State to articulate race‑neutral explanations for its strikes.  Id. 
Once the prosecutor has articulated race‑neutral explanations, the
burden shifts back to the defendant to show that the explanations are really a
pretext for discrimination.  Id.  The trial court must then determine whether
the defendant has carried his burden of proving discrimination.  Id. 
The trial court=s determination is accorded great
deference and will not be overturned on appeal unless it is clearly
erroneous.  Id.; Watkins v.
State, 245 S.W.3d 444, 448 (Tex. Crim. App.), cert. denied, 129 S.
Ct. 92 (2008).  

Appellate courts
must give great deference to credibility and demeanor determinations made by
the trial court in connection with a Batson inquiry, and the court of
criminal appeals has explained our review of a Batson ruling as follows,

In
assaying the record for clear error, vel non, the reviewing court should
consider the entire record of voir dire; it need not limit itself to arguments
or considerations that the parties specifically called to the trial court=s attention so long as those
arguments or considerations are manifestly grounded in the appellate
record.  But a reviewing court should
examine a trial court=s conclusion that a facially race‑neutral
explanation for a peremptory challenge is genuine, rather than a pretext, with
great deference, reversing only when that conclusion is, in view of the record
as a whole, clearly erroneous.

 








Watkins, 245 S.W.3d at 448
(citations omitted).  Factors that the
United States Supreme Court has considered to determine whether peremptory
challenges were used on a racially discriminatory basis include:  (1) whether the State struck a higher
percentage of African‑Americans than non‑African‑Americans,
(2) whether the State=s reasons for striking African‑Americans
appeared to apply equally to non‑African‑Americans whom the State
did not strike, (3) whether the State used jury shuffles in a manner that
supported an inference of racial discrimination, (4) whether the State
questioned African‑Americans and non‑African‑Americans
differently and in a way designed to obtain answers justifying strikes of
African‑Americans, and (5) whether the county in which the defendant was
prosecuted had a formal policy of excluding minority jurors from service.  See Miller-El v. Dretke, 545 U.S. 231,
240B64, 125 S. Ct.
2317, 2325B39 (2005).

B. 
Voir Dire

Before voir dire
began, Wilson=s counsel requested and received a jury
shuffle of the forty-eight member venire panel. 
At the conclusion of voir dire, the trial court struck veniremembers #3,
#7, #9, #13, #14, #26, #31, #35, #37, and #39 for cause.  The State used seven of its ten peremptory
strikes, striking veniremembers #4, #5, #11, #22, #29, #38, and #40; Wilson=s counsel used all
of her peremptory strikes, striking veniremembers #1, #11, #16, #19, #20, #21,
#23, #25, #33, and #36.  See Tex.
Code Crim. Proc. Ann. art. 35.15(b) (Vernon 2003).

Wilson=s counsel raised a
Batson objection at the conclusion of voir dire, challenging the State=s peremptory
strike of veniremember #40, stating that this individual was African-American, Awithin range,@ and Adid not give any
reason to have been struck.@[9]  The prosecutor responded as follows to the
trial court=s request for a race neutral reason for
striking veniremember #40:








There must be a prima faci[e] showing of a
non-race neutralCor a non-race neutral reason to exclude
this juror.  There has been none.  But the fact that she has a BA in criminal
justice, the fact that she lists as her TV shows [A]The First 48,[A] [A]CSI Miami,[A] [A]Head Hunters,[A] [A]Forensic Files[,A] and [A]The
Investigators[,@] and this is going to be a very forensic
evidence heavy case, and I don=t want somebody
that thinks they know what this is about from TV.[[10]]  And also she has a family member who has been
in the penitentiary, federal penitentiary, for some type of fraud.  And I don=t want to have
somebody on the jury that has a family member that is that close to them, as
[veniremember #40] because it was her sister, on the jury.[[11]]


After Wilson=s counsel
responded that she did not think that the facts that veniremember #40 watches
TV or has a degree in criminal justice were race neutral reasons to strike her,
the prosecutor pointed out that the State had also struck veniremember #5, a
white male with family members in prison, and veniremember #29, a white female Awhose fiancé is in
the pen.@  The prosecutor then argued that the State
struck everyone who had a family member that was in prison.[12]













Wilson=s counsel then
pointed out that juror #6 made it onto the jury panel, A[h]er husband
having been arrested and had a drug related case who was in jail[,]@[13]  and that juror #5 (formerly veniremember #12)
had a niece serving a sentence for bank robbery and two nephews that were
wanted and on the run.[14]  She argued that the State also did not strike
everyone who watches scientific crime television shows, such as juror #4
(formerly veniremember #10)[15]
and juror #12, who both watch ALaw & Order,@ and that
veniremember #40 never said that watching those shows would affect her ability
to be a juror.[16]  The prosecutor responded that veniremember
#40 was Athe only person
who only listed these shows@ and the only one
that had that many of the shows listed.[17]

The trial court
concluded as follows:

Well, my understanding what the State proferred has been
explanation is that . . . venireperson Number 40, was a person with great
interest in a number of shows.  In fact,
she listed four shows, is that right, on her questionnaire?  I don=t have the questionnaires. 
By the way, in fact, let me see the questionnaire.

 

. . . .

 








Okay.  All right. 
I am going to deny your Batson challenge. The Court is going to
make the finding the State offered a race neutral reason, that being that she
has a Bachelor of Arts degree in criminal justice, as well as her interest in
programs that deal[] with criminal investigation more so than other persons who
were not struck by the State.  I believe
that race neutral reason for it. 

C. 
Analysis

The decision to
strike a particular venireperson Ais a fluid
process, often hinging on the interaction of a number of variables and
permutations@ and it Ais unlikely that
two venirepersons on one panel will possess the same objectionable attribute or
character trait in precisely the same degree.@  Cantu v. State, 842 S.W.2d 667, 689
(Tex. Crim. App. 1992), cert. denied, 509 U.S. 926 (1993).  Thus, when the State has offered more than
one plausible reason for striking a venireperson, it is proper to review these
reasons in their entirety in order to assess whether the State=s explanation was
valid or merely pretextual, as we have set out above. See id.    








Under the
circumstances here, we cannot conclude that Wilson made a prima facie showing
of racial discrimination because other than veniremember #40 and Juror #4, we
cannot tell from the record how many of the forty-eight veniremembers were
African-American or how many African-Americans were in the strike zone.  See Williams, 301 S.W.3d at 688; cf.
Miller-El, 545 U.S. at 240B41, 125 S. Ct. at
2325 (A>The prosecutors
used their peremptory strikes to exclude 91% of the eligible African-American
venire members . . . . Happenstance is unlikely to produce this disparity=@ (internal
citation omitted)); Leadon v. State, Nos. 01-08-00839-CR,
01-08-00840-CR, 2010 WL 143467, at *11 (Tex. App.CHouston [1st
Dist.] Jan. 14, 2010, no pet.) (observing that the State used a statistically
disproportionate number of strikes on African-American members of the
venirepanel when 14.29% of the panel within the strike zone were black, but the
State used 36.36% of its strikes on black panel members, resulting in a prima
facie case of racial discrimination).  

Nonetheless,
assuming that Wilson made his prima facie showing, we cannot say, based on this
record, that the trial court=s decision to deny
his Batson challenge was clearly erroneous.  Wilson=s counsel, and not
the prosecutor, requested the jury shuffle, and veniremember #40 was originally
veniremember #23Cwell within the strike zone.  Cf. Miller-El, 545 U.S. at 253B54, 125 S. Ct. at
2332B33 (stating that
the prosecution=s shuffles raised a suspicion that the
State sought to exclude African-Americans from the jury). 

And
notwithstanding the State=s failure to strike everyone who had ever
known anyone who had been incarceratedCwhich the trial
court did not include as a reason for its decisionCveniremember #40
was not the only veniremember that the State struck for having an interest in
scientific evidence, and she was the only one revealed on this record to have a
degree in criminal justice.[18]  Cf. id. at 241B53, 125 S. Ct. at
2325B32 (referencing
panelists= voir dire and questionnaire answers to
determine whether prosecutor=s proffered reason
to strike applied just as well to an otherwise-similar nonblack who was
permitted to serve).  Therefore, we
overrule Wilson=s fifth point.








VI.  Conclusion

Having overruled
all of Wilson=s points, we affirm the trial court=s judgment.

 

PER CURIAM

PANEL: 
MCCOY, WALKER, and MEIER, JJ.

DO
NOT PUBLISH

Tex. R. App. P. 47.2(b)

DELIVERED: October 28, 2010











[1]See Tex. R. App. P. 47.4.





[2]See Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712
(1986).





[3]Fuller identified Wilson at trial
as the shooter.





[4]Reyes did not survive the
shooting.  We affirmed Wilson=s conviction for the capital murder
of Reyes in Wilson v. State, No. 02-06-00136-CR, 2007 WL 1879792 (Tex.
App.CFort Worth June 28, 2007, pet. ref=d) (mem. op., not designated for
publication). 





[5]Wilson told her that he had been in
a fight with his girlfriend and needed to get out of there, and then, A[o]ut of the blue he just turned
and said:  >Where are we?  Where am I?=@ 
She thought it odd that he did not know where his girlfriend lived. 





[6]Wilson shot Stewart in both arms,
both sides of his chest, and once Ain the butt,@ causing severe injuries that required several surgeries.





[7]In his third and fourth points,
Wilson complains about the admission of testimony about the Reyes murder as an
extraneous offense.  However, an
appellate court must consider all evidence actually admitted at trial in its
sufficiency review and give it whatever weight and probative value it could
rationally convey to a jury.  See Moff
v. State, 131 S.W.3d 485, 489 (Tex. Crim. App. 2004).  





[8]That is, testimony by Fuller,
Rosenhaur, Salicco, and Detectives Worman and Lopez.





[9]The trial court took judicial
notice that Wilson is African-American.





[10]The prosecutor made clear during
the State=s voir dire that this concerned himCimmediately after questioning
veniremember #40 about motive and medical records, he stated,

 

Now, DNA, fingerprints, a robbery
on videotape.  Okay.  Anything like that, anything you see in [A]CSI Miami,[A] [A]Forensic Files,[A] any of those shows that you guys
love to watch, okay, where they get DNA in like 30 seconds, it takes me like
eight months to get DNA. Okay.  It doesn=t take 30 seconds.  Those are things that we do not have to prove
to you.  Okay?





[11]Veniremember #40 stated during voir
dire that her sister had been to federal prison and that it had made her sister
a better person.  She said, AI hate to say it but I am not glad
she went through it but she came out a better person.@





[12]More accurately, the State struck
everyone who had a member of his or her immediate family either in jail or recently
incarceratedCthat is, veniremembers #4 (son in
jail over the summer for probation problems, now out on probation) and #29
(fiancé in prison for forgery).  Juror #1
(formerly veniremember #2) said that her best friend=s daughter had gone to jail for
sixty days but was out now.  Juror #12
(formerly veniremember #30) said that her ex-husband had been subjected to an
illegal search, resulting in his incarceration for four days several years
ago.  Juror #6 (formerly veniremember
#15) stated, 

 

My husband and both brothers have
been in prison or jail before.  It=s been quite a few years ago.  But they came out a better person [sic] and
have good lives now.  So I don=t think it would sway my
judgment.  But I am sure they had a tough
time while they were there.  But it=s over.  It=s been many years ago[.] 





[13]The jury questionnaires were not
included in the record, and nothing was revealed on voir dire about the nature
of the crime committed by juror #6=s husband. 





[14]Juror #5 said that his niece was in
prison for bank robbery but he does not correspond directly with her and that
he had two nephews on the run for petty crimes.





[15]The court observed that Juror #4 is
African-American.





[16]The State struck veniremember #22,
who gave the following responses during voir dire with regard to proof that the
robbery was committed with a weapon:

 

[State]:  [W]hat do you think you=d like to see?

 

[Veniremember #22]:  Well, a video or something would be nice to
that effect.

 

[State]:  Maybe the victim who had the gun pointed at
them?

 

[Veniremember #22]:  Yeah. 
And there is [sic] witnesses.  But
I also would have to make sure that the witness positively ID=s the Defendant.

 

[State]:  Positively ID, do you think maybe sometimes
witnesses= memories can be shak[y]?

 

[Veniremember #22]:  Yes, I do.

 

[State]: And if you had maybe a
shaky ID, would you want to see fingerprint or DNA or something like that?

 

[Veniremember #22]:  It would be nice.

 

[State]:  Okay. 
I appreciate that.  Thank you,
sir.





[17]During the State=s voir dire, veniremember #40
acknowledged that she watched ALaw & Order,@ ACSI,@ and AForensic Files.@





[18]As previously noted, the jury
questionnaires were not included in the record.