

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

**NO. 02-09-00039-CR**

STANLEY DEWAYNE WILSON                                APPELLANT

V.

THE STATE OF TEXAS                                           STATE

------------

FROM THE 213TH DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. Introduction

In five points, Appellant Stanley Dewayne Wilson appeals his conviction for aggravated robbery with a deadly weapon. We affirm.

---

[1] *See* Tex. R. App. P. 47.4.

## II.  Factual and Procedural History

Wilson pleaded not guilty to aggravated robbery with a deadly weapon, and a jury found him guilty and assessed his punishment at ninety-nine years' confinement.  In addition to his complaints about the trial court's admission of extraneous offense evidence and its denial of his *Batson* challenge during voir dire,[2] Wilson complains that the evidence is legally and factually insufficient to support his conviction.  Therefore, we will discuss the facts in greater detail below.

## III.  Sufficiency of the Evidence

In his first two points, Wilson complains that the evidence is legally and factually insufficient to support his conviction for aggravated robbery with a deadly weapon.  However, we will review the evidence only under the legal sufficiency standard because the court of criminal appeals has recently overruled *Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996) (setting out the factual sufficiency standard of review) and decided "that the *Jackson v. Virginia* legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt."  *Brooks v. State*, No. PD-0210-09, 2010 WL 3894613, at *1, 14 (Tex. Crim. App. Oct. 6, 2010).

---

[2] *See Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712 (1986).

2

**A. Standard of Review**

In reviewing the legal sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

**B. Aggravated Robbery with a Deadly Weapon**

A person commits aggravated robbery if, in the course of committing theft and with intent to obtain or maintain control of the property, he intentionally or knowingly threatens or places another in fear of imminent bodily injury or death and uses or exhibits a deadly weapon. *See* Tex. Penal Code Ann. § 29.03(a)(2) (Vernon 2003). A person commits theft if he unlawfully appropriates property with intent to deprive the owner of the property. *Id.* § 31.03(a) (Vernon 2003). An appropriation of property is unlawful if it is without the owner's effective consent. *Id.* § 31.03(b)(1).

**C. Evidence**

**1. First Robbery—Sandro Reyes**

Dawn Fuller stated that on the night in question—April 29, 2005—she lived at Cypress Club Apartments in Arlington, in a second-story apartment that overlooked the parking lot. She stated that she heard raised voices in the parking lot in the early

3

morning. She looked outside, saw Wilson[3] and her neighbor Sandro Reyes, heard a "pop and . . . an ugh sound," and then saw Reyes hit the ground.[4] She watched as Wilson rifled through Reyes's pockets and took Reyes's keys. He then used the keys to take Reyes's truck, but he backed it into a culvert. She continued to watch as Wilson emerged from the truck and ran away up the culvert. She described Wilson as follows: "Slim build, black guy, low haircut." She also stated that he was wearing "[d]ark bottoms [and a] long white tank top" that evening.

While outside with the police, Fuller heard a couple of gunshots coming from the right, to the northeast of the apartment complex.

## 2. Second Robbery—Scott Stewart

On April 29, 2005, Scott Stewart lived at 1701 Monaco Drive in Arlington. Larea Buckley and Stewart were outside on his porch around 1:00 a.m. when they heard a loud bang like a gunshot, followed by some sirens a few minutes later. Shortly thereafter, Buckley started home. She had barely driven past five houses when Wilson flagged her down. He was in the middle of the road, waving his arms frantically.

---

[3] ... Fuller identified Wilson at trial as the shooter.

[4] ... Reyes did not survive the shooting. We affirmed Wilson's conviction for the capital murder of Reyes in *Wilson v. State*, No. 02-06-00136-CR, 2007 WL 1879792 (Tex. App.—Fort Worth June 28, 2007, pet. ref'd) (mem. op., not designated for publication).

4

When Buckley slowed down, Wilson ran up to her window and asked her for a ride. Although she could not see him very well, she let him in. She saw Wilson more clearly when the car's interior lights came on and realized that she "made a major mistake." Sweat poured down his face, and he kept looking around frantically like someone was after him.[5] Her description of Wilson's attire matched Fuller's above: a white "wife-beater" tank top-style T-shirt and blue jeans.

Buckley turned the car around and headed back to Stewart's house. When they arrived there, she told Wilson that she wanted her friend to do the driving. She stayed in the running car while she waited for Stewart. Stewart saw them from his bedroom window and made his way outside to the driveway. She told him that Wilson needed a ride. Stewart spoke with Wilson from the outside of the vehicle through the driver's side window, and Wilson told him that he needed to get to Dallas. Stewart replied that they would not take him to Dallas or give him a ride.

Wilson stepped out of the car and looked like he was going to walk away, but after a few steps, he returned to the driver's side of the vehicle, where Buckley and Stewart were standing. Buckley testified that Wilson begged and pleaded with them for a ride, and he lunged towards the driver's side of the car more than once, trying to jump into the vehicle. Stewart barred Wilson's way and told Buckley to get in the

---

[5] ... Wilson told her that he had been in a fight with his girlfriend and needed to get out of there, and then, "[o]ut of the blue he just turned and said: 'Where are we? Where am I?'" She thought it odd that he did not know where his girlfriend lived.

house and call the police. Stewart testified that Wilson confronted him with a drawn gun and opened fire.

Buckley testified that when she turned around before going inside the house to call the police, she saw Wilson draw a silver handgun and fire the first shot into Stewart. She stated that she thought that, since they were not going to give Wilson a ride, he was going to take her car "to get out of there." Stewart testified that he thought he might die when Wilson started firing—Wilson was only four feet away when he started shooting—and, based on Wilson's demeanor and actions, he thought Wilson was trying to take the car. Wilson shot Stewart a total of five times while Buckley called the police.[6]

Stewart's wounds were inflicted as he tried to take a defensive posture and go for the gun. When the shooting stopped, he kicked the gun out of Wilson's hand and tackled Wilson. He testified that he remembers hitting the ground, that he blacked out "a little bit," and that when he regained consciousness, Wilson was running away. Stewart acknowledged on cross-examination that it would have been pretty easy for someone to take the car once he was down. But he also replied, "yes," when asked whether he was "able to position [him]self in such a way that the car was never entered[.]"

---

[6] ... Wilson shot Stewart in both arms, both sides of his chest, and once "in the butt," causing severe injuries that required several surgeries.

6

After Wilson ran off, Stewart calmly walked to the top of the driveway and sat down "Indian Style" to wait for an ambulance. When Buckley came back outside, there was blood everywhere. Buckley testified that she still finds blood from the shooting inside her car.

### 3. Police Investigation

Arlington Police Detective Brett Worman testified that he was a patrol officer in April 2005 and was dispatched to the Cypress Club Apartments at 1:39 a.m. when the shooting was reported. When he arrived, he saw a truck backed into a drainage culvert on the north side of the apartment complex. He and the other attending officers cleared that vehicle first to make sure the suspect was not still there, then attended to Reyes, who was laying on his back in the parking lot with a gunshot wound.

At 1:52 a.m.—thirteen minutes after his initial dispatch to the Cypress Club Apartments—Detective Worman was dispatched to a shooting-in-progress call at 1701 Monaco Drive. He testified that, running police lights and sirens, it takes thirty to forty-five seconds to get from the Cypress Club Apartments to Stewart's house and that they are approximately half a mile apart. When he arrived, he found Stewart sitting "Indian-style" at the top of the driveway, and he could not tell how many times Stewart had been shot because of the amount of blood. Stewart told him that he had been shot by a black male. Detective Worman applied pressure to

7

Stewart's wounds until the paramedics arrived a few minutes later, and then he roped off the crime scene.

Elizabeth Rosenhaur and Peter Salicco, who were both Arlington Police Department crime scene investigators at the time, also testified at trial. They arrived separately at the Cypress Club Apartments around 2 a.m.; Reyes was already dead. Salicco went on to the Monaco Drive crime scene. Rosenhaur photographed the Cypress Club crime scene, collected blood that had spilled near where Reyes's body was found, and collected fingerprints from the truck in the culvert. When asked whether it appeared to her that someone could drive the truck out of the culvert, Rosenhaur said no.

Salicco photographed the Monaco Drive crime scene and fingerprinted Buckley's vehicle. He stated that there was a lot of blood at the scene and that, based on the amount of Stewart's blood loss, he was surprised Stewart survived. He stated that he photographed blood on the inside of Buckley's vehicle on the driver's side and that the explanation for that was either the window was down, or the door open, at the time of the shooting. There was also blood on the exterior side of the door and blood spatter on the ground next to the driver's side of the vehicle. Blood had pooled at the top of the driveway. He found bullet fragments at the scene, and a bloody t-shirt was collected in the yard of 2010 Monaco Drive, just down the street from the crime scene.

Salicco, a latent print examiner, performed the physical examination on the fingerprints that he and Rosenhaur had collected at the two crime scenes after they were run through the Automated Fingerprint Identification System (AFIS). He testified that the fingerprints that he lifted from the outside of the passenger side door matched Wilson's, as did the fingerprints that Rosenhaur collected from the exterior driver's side door of Reyes's pickup, and that no two people in the world have the same fingerprints.

Four days later, Dallas Police Officer Christopher Lewis arrested Wilson at a Dallas apartment complex. Wilson's sister answered the door and gave police permission to search the apartment. They found Wilson hiding in a hall closet. Officer Lewis described Wilson's demeanor as "kind of defeated. I mean, he . . . he just knew that he had been caught and that was it."

Arlington Police Detective Ben Lopez, the lead detective on the case, testified that he took buccal swaps of both Wilson and Stewart. Constance Patton, senior forensic biologist and DNA technical leader for the Tarrant County Medical Examiner's Officer crime laboratory, testified that she tested the bloody t-shirt found on Monaco Drive and Wilson's shoes and pants that he was wearing when he was arrested. The presumptive test for blood that she performed on the shoes indicated that blood was present, and the stain on the left shoe had male DNA from at least two individuals. Wilson and Stewart could not be excluded from the .001% of the population who could have contributed that DNA.

9

Patton tested two different areas on the t-shirt: the neck and one of the blood stains on the front. From the neck sample, she stated that neither Wilson nor Stewart could be excluded—they fell within the 0.6% of the population that had the types possible to contribute to the mixture—but that there were some other "types" that were also detected that could not have originated with either one. Therefore, she was unable, on the probability of exclusion, to say with any certainty whose T-shirt it was. The bloodstain found on the shirt belonged to Stewart.

Patton testified that, as to the pants, one of the stains tested positive for blood, but it met a partial profile of Wilson and excluded both Stewart and Reyes. Another stain was a mixture, but most of it was from a male matching Stewart's DNA profile.

## D. Analysis

Wilson was charged with intentionally or knowingly, while in the course of committing theft of property and with intent to obtain or maintain control of said property, threatening or placing Scott Stewart in fear of imminent bodily injury or death on or about April 29, 2005, while using or exhibiting a deadly weapon (firearm). Wilson concedes that there is sufficient evidence to show that he committed aggravated assault, and based on the facts above, we agree.

Wilson specifically challenges the evidence to support the "in the course of committing theft of property and with the intent to maintain control of the property" aggravated robbery element, arguing that "[t]here were plenty of opportunities for the vehicle to have been stolen[,] [b]ut it did not happen."

10

We must review circumstantial evidence of intent with the same scrutiny as other elements of an offense. *Laster v. State*, 275 S.W.3d 512, 519–21 (Tex. Crim. App. 2009) (overruling *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000)).

Both Buckley and Stewart testified that they believed Wilson intended to steal Buckley's car, and their testimonies about his actions—such as lunging towards the driver's seat multiple times and his insistence on getting a ride to Dallas—viewed in the light most favorable to the prosecution—support the conclusion that a rational trier of fact could have found the essential elements of theft necessary for Wilson's aggravated robbery with a deadly weapon conviction. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778.

Furthermore, although Wilson argues that there were numerous opportunities for him to have stolen the vehicle, including after Stewart had been shot and was on the ground, the jury could have still concluded that Wilson intended to steal the vehicle. That is, until Buckley and Stewart refused to give in to his pleading for a ride back to Dallas, Wilson had no need to draw the gun and to attempt to take the vehicle by force. And Stewart also testified that he was able to position himself in such a way that Wilson never entered the vehicle.

Based on Buckley's and Stewart's testimonies, as well as Fuller's testimony about seeing Wilson search Reyes's pockets and take Reyes's keys after shooting him and before taking Reyes's vehicle, and the corroborating testimony about

11

Wilson's fingerprints on Reyes's vehicle—demonstrating that Wilson had already committed one theft of a vehicle that evening[7]—we conclude that the evidence is legally sufficient to support the theft element of Wilson's aggravated robbery with a deadly weapon conviction, and we overrule his second point.

## IV. Extraneous Offense Evidence

In his third and fourth points, Wilson argues that the trial court erred when it overruled his objection to the admission of the extraneous capital murder offense and when it ruled that the probative value of this extraneous offense evidence was not outweighed by its prejudicial effect.

## A. Standard of Review

The admissibility of evidence is within the trial court's discretion and will not be overturned absent an abuse of discretion. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). So long as the trial court's ruling lies within the zone of reasonable disagreement, the appellate court should affirm. *Id.*

---

[7] ... In his third and fourth points, Wilson complains about the admission of testimony about the Reyes murder as an extraneous offense. However, an appellate court must consider all evidence actually admitted at trial in its sufficiency review and give it whatever weight and probative value it could rationally convey to a jury. *See Moff v. State*, 131 S.W.3d 485, 489 (Tex. Crim. App. 2004).

12

**B. Analysis**

Wilson objected before each witness's testimony about the Reyes shooting,[8] principally citing evidence rules 403, 404(a)(1), and 404(b), the rules now argued before us. The trial court overruled each objection, finding that the evidence was "same transaction contextual evidence."

"Same transaction contextual evidence" is evidence reflecting the context in which a criminal act occurred. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000), *cert. denied*, 532 U.S. 944 (2001). It is a recognition that events do not occur in a vacuum, and a jury has a right to hear what occurred immediately before and after the offense in order to realistically evaluate the evidence. *Id.* Extraneous offenses may be admissible as same transaction contextual evidence when several crimes are intermixed, or blended with one another, or connected so that they form an indivisible criminal transaction. *Prible v. State*, 175 S.W.3d 724, 731–32 (Tex. Crim. App.), *cert. denied*, 546 U.S. 962 (2005). This type of evidence results when an extraneous matter is so intertwined with the State's proof of the charged offense that avoiding reference to it would make the State's case incomplete or difficult to understand. *Id.* at 732.

Evidence rule 404 states,

---

[8] ... That is, testimony by Fuller, Rosenhaur, Salicco, and Detectives Worman and Lopez.

13

(a) Character Evidence Generally. Evidence of a person's character or character trait is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:

(1) Character of accused. Evidence of a pertinent character trait offered:

    (A) by an accused in a criminal case, or by the prosecution to rebut the same . . .

    . . .

(b) Other Crimes, Wrongs or Acts. Evidence of other crimes, wrongs or acts is not admissible to prove the character of the person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon timely request by the accused in a criminal case, reasonable notice is given in advance of trial of intent to introduce in the State's case-in-chief such evidence other than that arising in the same transaction.

Tex. R. Evid. 404(a)(1), (b).

Wilson argues that the two offenses were not indivisibly connected because they were at two separate locations and because the Reyes murder was not necessary to the State proving the Stewart robbery. He further contends that Reyes's death did not occur immediately prior to the robbery and shooting. We disagree.

The crime scenes were close enough for Buckley and Stewart to hear the gunshot that killed Reyes and for Fuller to hear the gunshots that Wilson fired into Stewart. Less than thirteen minutes after police arrived at the Reyes murder scene and around half a mile away, Buckley encountered a sweating and frantic Wilson

14

looking to get back to Dallas. Until she and Stewart refused to give Wilson a ride in her vehicle, Wilson did not try to jump into the driver's side of Buckley's vehicle or draw his weapon and fire on Stewart. This evidence had little to do with the character of someone likely to steal a vehicle and actions in conformity therewith. *Cf.* Tex. R. Evid. 404(a)(1), (b). Rather, to the extent that it might otherwise not be same transaction contextual evidence of Wilson's shooting-and-vehicle-stealing crime spree on April 29, 2005, evidence of Reyes's shooting and the other evidence collected at the crime scene pertaining to the shooting (such as the truck in the culvert) demonstrated Wilson's motive, intent, and identity with regard to the Stewart aggravated robbery. *See* Tex. R. Evid. 404(b); *Prible*, 175 S.W.3d at 731–32. Therefore, we conclude that the trial court did not abuse its discretion by allowing this testimony.

Furthermore, under Texas Rule of Evidence 403, although otherwise relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, we do not believe the trial court abused its discretion by allowing the State to present this evidence. *See* Tex. R. Evid. 403. Considering the evidence's probative value against its potential to impress the jury in some irrational, indelible way, the time taken to develop the evidence, and the State's need for it, we cannot say on these facts that the trial court abused its discretion because—as stated above—the State needed this evidence to demonstrate Wilson's intent to steal a second vehicle within thirteen minutes after his first attempt ended with an

15

immovable truck in a drainage culvert. *See Erazo v. State*, 144 S.W.3d 487, 489 (Tex. Crim. App. 2004). Although Wilson killed Reyes, we do not think this fact would inflame the jury any more than Stewart's testimony about being shot five times at close range by Wilson, particularly in light of Stewart's descriptions of his wounds and the photographs of them that were presented to the jury. *See id.* And although a trial court must still perform a balancing test to see if same transaction contextual evidence's probative value is substantially outweighed by its prejudicial effect, the prejudicial nature of contextual evidence rarely renders such evidence inadmissible, as long as it sets the stage for the jury's comprehension of the whole criminal transaction, as it did here. *See Swarb v. State*, 125 S.W.3d 672, 681 (Tex. App.—Houston [1st Dist.] 2003, pet. dism'd). Therefore, we overrule Wilson's third and fourth points.

## V. *Batson* Challenge

In his fifth point, Wilson contends that the trial court erred when it overruled his *Batson* objection at the conclusion of voir dire.

### A. Standard of Review

A defendant objecting under *Batson* must make a prima facie showing of racial discrimination in the State's exercise of its peremptory strikes. *Williams v. State*, 301 S.W.3d 675, 688 (Tex. Crim. App. 2009), *cert. denied*, 130 S. Ct. 3411 (2010). The burden then shifts to the State to articulate race-neutral explanations for its strikes. *Id.* Once the prosecutor has articulated race-neutral explanations, the

16

burden shifts back to the defendant to show that the explanations are really a pretext for discrimination. *Id.* The trial court must then determine whether the defendant has carried his burden of proving discrimination. *Id.* The trial court's determination is accorded great deference and will not be overturned on appeal unless it is clearly erroneous. *Id.*; *Watkins v. State*, 245 S.W.3d 444, 448 (Tex. Crim. App.), *cert. denied*, 129 S. Ct. 92 (2008).

Appellate courts must give great deference to credibility and demeanor determinations made by the trial court in connection with a *Batson* inquiry, and the court of criminal appeals has explained our review of a *Batson* ruling as follows,

> In assaying the record for clear error, *vel non*, the reviewing court should consider the entire record of voir dire; it need not limit itself to arguments or considerations that the parties specifically called to the trial court's attention so long as those arguments or considerations are manifestly grounded in the appellate record. But a reviewing court should examine a trial court's conclusion that a facially race-neutral explanation for a peremptory challenge is genuine, rather than a pretext, with great deference, reversing only when that conclusion is, in view of the record as a whole, clearly erroneous.

*Watkins,* 245 S.W.3d at 448 (citations omitted). Factors that the United States Supreme Court has considered to determine whether peremptory challenges were used on a racially discriminatory basis include: (1) whether the State struck a higher percentage of African-Americans than non-African-Americans, (2) whether the State's reasons for striking African-Americans appeared to apply equally to non-African-Americans whom the State did not strike, (3) whether the State used jury shuffles in a manner that supported an inference of racial discrimination, (4)

17

whether the State questioned African-Americans and non-African-Americans differently and in a way designed to obtain answers justifying strikes of African-Americans, and (5) whether the county in which the defendant was prosecuted had a formal policy of excluding minority jurors from service. *See Miller-El v. Dretke*, 545 U.S. 231, 240–64, 125 S. Ct. 2317, 2325–39 (2005).

## B.  Voir Dire

Before voir dire began, Wilson's counsel requested and received a jury shuffle of the forty-eight member venire panel.  At the conclusion of voir dire, the trial court struck veniremembers #3, #7, #9, #13, #14, #26, #31, #35, #37, and #39 for cause. The State used seven of its ten peremptory strikes, striking veniremembers #4, #5, #11, #22, #29, #38, and #40; Wilson's counsel used all of her peremptory strikes, striking veniremembers #1, #11, #16, #19, #20, #21, #23, #25, #33, and #36.  *See* Tex. Code Crim. Proc. Ann. art. 35.15(b) (Vernon 2003).

Wilson's counsel raised a *Batson* objection at the conclusion of voir dire, challenging the State's peremptory strike of veniremember #40, stating that this individual was African-American, "within range," and "did not give any reason to have been struck."[9]  The prosecutor responded as follows to the trial court's request for a race neutral reason for striking veniremember #40:

> There must be a prima faci[e] showing of a non-race neutral—or a non-race neutral reason to exclude this juror.  There has been none.  But

[9]... The trial court took judicial notice that Wilson is African-American.

18

the fact that she has a BA in criminal justice, the fact that she lists as her TV shows ["]The First 48,["] ["]CSI Miami,["] ["]Head Hunters,["] ["]Forensic Files[,"] and ["]The Investigators[,"] and this is going to be a very forensic evidence heavy case, and I don't want somebody that thinks they know what this is about from TV.[10]  And also she has a family member who has been in the penitentiary, federal penitentiary, for some type of fraud.  And I don't want to have somebody on the jury that has a family member that is that close to them, as [veniremember #40] because it was her sister, on the jury.[11]

After Wilson's counsel responded that she did not think that the facts that veniremember #40 watches TV or has a degree in criminal justice were race neutral reasons to strike her, the prosecutor pointed out that the State had also struck veniremember #5, a white male with family members in prison, and veniremember #29, a white female "whose fiancé is in the pen."  The prosecutor then argued that the State struck everyone who had a family member that was in prison.[12]

---

[10] ... The prosecutor made clear during the State's voir dire that this concerned him—immediately after questioning veniremember #40 about motive and medical records, he stated,

> Now, DNA, fingerprints, a robbery on videotape.  Okay.  Anything like that, anything you see in ["]CSI Miami,["] ["]Forensic Files,["] any of those shows that you guys love to watch, okay, where they get DNA in like 30 seconds, it takes me like eight months to get DNA. Okay.  It doesn't take 30 seconds.  Those are things that we do not have to prove to you.  Okay?

[11] ... Veniremember #40 stated during voir dire that her sister had been to federal prison and that it had made her sister a better person.  She said, "I hate to say it but I am not glad she went through it but she came out a better person."

[12] ... More accurately, the State struck everyone who had a member of his or her immediate family either in jail or *recently* incarcerated—that is, veniremembers #4 (son in jail over the summer for probation problems, now out on probation) and

19

Wilson's counsel then pointed out that juror #6 made it onto the jury panel, "[h]er husband having been arrested and had a drug related case who was in jail[,]"[13] and that juror #5 (formerly veniremember #12) had a niece serving a sentence for bank robbery and two nephews that were wanted and on the run.[14] She argued that the State also did not strike everyone who watches scientific crime television shows, such as juror #4 (formerly veniremember #10)[15] and juror #12, who both watch "Law & Order," and that veniremember #40 never said that watching those shows would affect her ability to be a juror.[16] The prosecutor responded that veniremember #40

---

#29 (fiancé in prison for forgery). Juror #1 (formerly veniremember #2) said that her best friend's daughter had gone to jail for sixty days but was out now. Juror #12 (formerly veniremember #30) said that her ex-husband had been subjected to an illegal search, resulting in his incarceration for four days several years ago. Juror #6 (formerly veniremember #15) stated,

> My husband and both brothers have been in prison or jail before. It's been quite a few years ago. But they came out a better person [sic] and have good lives now. So I don't think it would sway my judgment. But I am sure they had a tough time while they were there. But it's over. It's been many years ago[.]

[13] ... The jury questionnaires were not included in the record, and nothing was revealed on voir dire about the nature of the crime committed by juror #6's husband.

[14] ... Juror #5 said that his niece was in prison for bank robbery but he does not correspond directly with her and that he had two nephews on the run for petty crimes.

[15] ... The court observed that Juror #4 is African-American.

[16] ... The State struck veniremember #22, who gave the following responses during voir dire with regard to proof that the robbery was committed with a weapon:

[State]: [W]hat do you think you'd like to see?

20

was "the only person who only listed these shows" and the only one that had that many of the shows listed.[17]

The trial court concluded as follows:

> Well, my understanding what the State proferred has been explanation is that . . . venireperson Number 40, was a person with great interest in a number of shows. In fact, she listed four shows, is that right, on her questionnaire? I don't have the questionnaires. By the way, in fact, let me see the questionnaire.
>
> . . . .
>
> Okay. All right. I am going to deny your *Batson* challenge. The Court is going to make the finding the State offered a race neutral reason, that being that she has a Bachelor of Arts degree in criminal

---

[Veniremember #22]: Well, a video or something would be nice to that effect.

[State]: Maybe the victim who had the gun pointed at them?

[Veniremember #22]: Yeah. And there is [sic] witnesses. But I also would have to make sure that the witness positively ID's the Defendant.

[State]: Positively ID, do you think maybe sometimes witnesses' memories can be shak[y]?

[Veniremember #22]: Yes, I do.

[State]: And if you had maybe a shaky ID, would you want to see fingerprint or DNA or something like that?

[Veniremember #22]: It would be nice.

[State]: Okay. I appreciate that. Thank you, sir.

[17] ... During the State's voir dire, veniremember #40 acknowledged that she watched "Law & Order," "CSI," and "Forensic Files."

21

justice, as well as her interest in programs that deal[] with criminal investigation more so than other persons who were not struck by the State. I believe that race neutral reason for it.

## C. Analysis

The decision to strike a particular venireperson "is a fluid process, often hinging on the interaction of a number of variables and permutations" and it "is unlikely that two venirepersons on one panel will possess the same objectionable attribute or character trait in precisely the same degree." *Cantu v. State*, 842 S.W.2d 667, 689 (Tex. Crim. App. 1992), *cert. denied*, 509 U.S. 926 (1993). Thus, when the State has offered more than one plausible reason for striking a venireperson, it is proper to review these reasons in their entirety in order to assess whether the State's explanation was valid or merely pretextual, as we have set out above. *See id.*

Under the circumstances here, we cannot conclude that Wilson made a prima facie showing of racial discrimination because other than veniremember #40 and Juror #4, we cannot tell from the record how many of the forty-eight veniremembers were African-American or how many African-Americans were in the strike zone. *See Williams*, 301 S.W.3d at 688; *cf. Miller-El*, 545 U.S. at 240–41, 125 S. Ct. at 2325 ("'The prosecutors used their peremptory strikes to exclude 91% of the eligible African-American venire members . . . . Happenstance is unlikely to produce this disparity'" (internal citation omitted)); *Leadon v. State*, Nos. 01-08-00839-CR, 01-08-00840-CR, 2010 WL 143467, at *11 (Tex. App.—Houston [1st Dist.] Jan. 14, 2010, no pet.) (observing that the State used a statistically disproportionate number of

22

strikes on African-American members of the venirepanel when 14.29% of the panel within the strike zone were black, but the State used 36.36% of its strikes on black panel members, resulting in a prima facie case of racial discrimination).

Nonetheless, assuming that Wilson made his prima facie showing, we cannot say, based on this record, that the trial court's decision to deny his *Batson* challenge was clearly erroneous. Wilson's counsel, and not the prosecutor, requested the jury shuffle, and veniremember #40 was originally veniremember #23—well within the strike zone. *Cf. Miller-El*, 545 U.S. at 253–54, 125 S. Ct. at 2332–33 (stating that the prosecution's shuffles raised a suspicion that the State sought to exclude African-Americans from the jury).

And notwithstanding the State's failure to strike everyone who had ever known anyone who had been incarcerated—which the trial court did not include as a reason for its decision—veniremember #40 was not the only veniremember that the State struck for having an interest in scientific evidence, and she was the only one revealed on this record to have a degree in criminal justice.[18] *Cf. id.* at 241–53, 125 S. Ct. at 2325–32 (referencing panelists' voir dire and questionnaire answers to determine whether prosecutor's proffered reason to strike applied just as well to an otherwise-similar nonblack who was permitted to serve). Therefore, we overrule Wilson's fifth point.

---

[18] As previously noted, the jury questionnaires were not included in the record.

## VI.  Conclusion

Having overruled all of Wilson's points, we affirm the trial court's judgment.

PER CURIAM

PANEL:  MCCOY, WALKER, and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: October 28, 2010