

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-18-00178-CR

_____

KYRON DYLNN ADAMS, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 124th District Court
Gregg County, Texas
Trial Court No. 46,639-B

Before Morriss, C.J., Burgess and Carter,* JJ.
Memorandum Opinion by Justice Burgess

_____

*Jack Carter, Justice, Retired, Sitting by Assignment

# MEMORANDUM OPINION

Kyron Dylnn Adams appeals his conviction for murder.[1] After reviewing the record and applicable law, we find that the trial court did not err in denying Adams' *Batson* complaint or in refusing Adams' request for a lesser-included offense instruction in the court's charge to the jury. We affirm the trial court's judgment and sentence.

## I. Factual Background

Adams shot Thomas Harper in the back, in the early morning hours of February 4, 2017, in the parking lot outside J's Place, a nightclub in Longview.[2] According to the testimony, Harper had previously attacked Adams' friend, Kenneth Fiengo, rendering Fiengo unconscious. Witness Michael Allison, a friend of Harper's, testified that after Harper hit Fiengo, Adams approached Harper and the men sparred a bit, then parted ways. Allison then saw Adams travel along side the building and fire one shot at Harper. Adams then went behind the building, out of Allison's view. Subsequently, Allison heard two more shots.[3] Allison said Adams retrieved the gun from a car after his initial fight with Harper. Harper was dead by the time law enforcement and emergency personnel arrived.

---

[1]*See* TEX. PENAL CODE ANN. § 19.02(b)(1). Adams was sentenced to seventy-five years' incarceration.

[2]Harper's autopsy indicated he had been shot in the back, with an exit wound from his chest, from at least two feet away.

[3]Three shell casings were found at the scene.

## II. Adams' *Batson* Claim

After the parties conducted voir dire—but before the trial court seated the jury—Adams claimed the State had improperly used two of its peremptory strikes against African-American members of the venire. Adams only complains of one of these strikes on appeal.

### A. Standard of Review

Although Texas law allows parties to make peremptory strikes of venirepersons following voir dire,[4] such strikes cannot be used to violate a party's Equal Protection Clause rights by striking venirepersons because of their race. *See Batson v. Kentucky*, 476 U.S. 79, 89 (1986); *see also* U.S. CONST. amend. XIV, § 1. In *Colone v. State*, the Texas Court of Criminal Appeals succinctly summarized the law and procedure regarding *Batson* challenges:

> In *Batson v. Kentucky*, the Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment prohibits the State from exercising a peremptory challenge against a juror on the basis of race. A three-step process is used to analyze *Batson* claims: (1) the opponent of the peremptory challenge must present a *prima facie* case of racial discrimination, (2) if that is done, the burden shifts to the proponent of the peremptory challenge to present a race-neutral reason for the challenge, and (3) if that is done, the trial court must then determine whether the opponent has proven purposeful racial discrimination. We will assume that the State's allegation that it had race-neutral reasons for the peremptory challenge renders step one of the *Batson* analysis moot. At step two, the proponent of the peremptory challenge need only tender an explanation that is racially neutral on its face. If the explanation at the second step is determined to be race neutral, then at step three, the opponent of the peremptory challenge bears the burden of persuasion to show that the race-neutral explanation is not genuine (that the peremptory challenge was indeed a product of purposeful discrimination).

*Colone v. State*, 573 S.W.3d 249, 262–63 (Tex. Crim. App. 2019) (footnotes omitted) (citations omitted).

---

[4]*See* TEX. CODE CRIM. PROC. ANN. art. 35.15(b).

3

**B.     Discussion**

At trial, Adams argued that the State had "conducted meaningless voir dire" with the venireperson at issue. The State responded that the venireperson was a postal worker and that it "ha[d] struck anyone who work[ed] for the United States Postal Service." The State continued, "If there had been more than one United States Postal worker on here, they would have all been struck." Adams offered no rebuttal to the State's explanation.

The fact that a venireperson is employed with the United States Post Office has been held to be a racially neutral reason for exercising a peremptory strike. *See Tompkins v. State*, 774 S.W.2d 195, 206 (Tex. Crim. App. 1987); *Leadon v. State*, 332 S.W.3d 600, 614 (Tex. App.— Houston [1st Dist.] 2010, no pet.). Consequently, once the State explained its basis for striking the venireperson in question, it established a race-neutral basis for exercising the strike, and Adams then bore the burden to rebut the State's proffered reason. Nevertheless, Adams "[made] no attempt to show that this race-neutral explanation [was] not genuine or to show purposeful racial discrimination." *Colone*, 573 S.W.3d at 263. Accordingly, Adams failed to rebut the State's race-neutral reason, and the trial court did not err in overruling his *Batson* complaint. We overrule the first point of error.[5]

---

[5]In his brief, Adams directs us to *Keeton v. State*, 749 S.W.2d 861 (Tex. Crim. App. 1988), for the proposition that "[g]eneral assumptions about occupational or group bias against a party do not justify a strike in the absence of evidence that the particular veniremen bears any other undesirable characteristics." This is not a correct reading of *Keeton*. To the extent *Keeton* references improper use of one's occupation as a potential pretext for racial discrimination, those mentions are, at most, dicta. *See id.* at 867, 868. The challenged strikes in *Keeton* were held to be race neutral. The State's reasons for the strikes were: one venireperson had a close relationship to the defendant and his family, one evinced a bias against the State because he had been prosecuted for and convicted of a misdemeanor by the State, and one said he would hold the State to a higher burden of proof because it was a death penalty case. *Id.* at 870.

4

### III.     Adams Was Not Entitled to Instruction on Criminally Negligent Homicide

In his second point of error, Adams claims the trial court should have instructed the jury on the lesser-included offense of criminally negligent homicide.[6]  Because the record does not show that Adams failed to appreciate the risk of wielding a pistol in the middle of an altercation, we find that he was not entitled to the requested instruction.

#### A.     Standard of Review

In order to be entitled to a lesser-included-offense instruction, the record must "contain some affirmative evidence that would permit a jury rationally to find that, if a defendant is guilty, he is guilty only of the lesser-included offense." *Nguyen v. State*, 506 S.W.3d 69, 81 (Tex. App.—Texarkana 2016, pet. ref'd) (citing *Schmidt v. State*, 278 S.W.3d 353, 362 (Tex. Crim. App. 2009)). Thus, "[t]he evidence must establish the lesser-included offense as a valid rational alternative to the charged offense." *Id.* (citing *Wesbrook v. State*, 29 S.W.3d 103, 113–14 (Tex. Crim. App. 2000)). "Anything more than a scintilla of evidence is sufficient to entitle a defendant to an instruction on the lesser charge." *Id.* (citing *Ferrel v. State*, 55 S.W.3d 586, 589 (Tex. Crim. App. 2001)).

"However, if a defendant . . . presents no evidence and there is no affirmative evidence otherwise showing he is guilty only of a lesser-included offense, then a charge on a lesser-included offense is not required." *Id.* (citing *Bignall v. State*, 887 S.W.2d 21, 22–24 (Tex. Crim. App. 1994); *Aguilar v. State*, 682 S.W.2d 556, 558 (Tex. Crim. App. 1985)). Additionally, "it is not

---

[6]"Criminally negligent homicide is a lesser included offense of murder." *Saunders v. State*, 840 S.W.2d 390, 391 (Tex. Crim. App. 1992) (per curiam).

enough that the jury may disbelieve crucial evidence pertaining to the greater offense, but rather, there must be some evidence directly germane to the lesser-included offense for the finder of fact to consider before an instruction on a lesser-included offense is warranted." *Hampton v. State*, 109 S.W.3d 437, 441 (Tex. Crim. App. 2003), *abrogated on other grounds by Grey v. State*, 298 S.W.3d 644 (Tex. Crim. App. 2009). To be entitled to a jury instruction on criminally negligent homicide, the record must contain some evidence the actor "failed to perceive the risk created by his conduct." *Trujillo v. State*, 227 S.W.3d 164, 168 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd); *see Still v. State*, 709 S.W.2d 658, 660 (Tex. Crim. App. 1986).

## B.      Discussion

In this case, there is no evidence that Adams failed to perceive the risk of firing a firearm in response to what he described as a wrestling match or fistfight. Adams testified that after Harper knocked Fiengo unconscious, he threatened Adams and chased him. Adams said he fled to his car where his friend Miguel Berrospe was sitting.[7] Yet, rather than lock the car door or drive away, Adams told Berrospe to "give [Adams] the gun." Adams testified that when he let go of the car door to put the gun in his pocket, Harper opened the car door and grabbed him, and the two then fought outside the car. According to Adams, Harper put him in a choke hold, and he was beginning to blackout when, Adams testified, he "just start[ed] shooting until he let me go." Adams testified that he did not see Harper again after that.

---

[7]Berrospe testified he was very intoxicated that night at J's Place. He did not remember anything after taking Xanax, cocaine, and shots of liquor, which he did in the parking lot before entering the club.

6

"[T]here must be some evidence that the defendant was guilty only of reckless or negligent conduct before an instruction on the lesser offense is required." *Navarro v. State*, 863 S.W.2d 191, 206 (Tex. App.—Austin 1993), *pet. ref'd*, 891 S.W.2d 648 (Tex. Crim. App. 1994). The Texas Court of Criminal Appeals explained the nature of criminal negligence—as compared to recklessness—as follows:

[R]eckless conduct . . . involves,

> conscious risk creation, that is, the actor is aware of the risk surrounding his conduct or the results thereof, but consciously disregards that risk. . . . Criminal negligence involves inattentive risk creation, that is, the actor ought to be aware of the risk surrounding his conduct or the results thereof. At the heart of reckless conduct is conscious disregard of the risk created by the actor's conduct; the key to criminal negligence is found in the failure of the actor to perceive the risk.

*Thomas v. State*, 699 S.W.2d 845, 849 (Tex. Crim. App. 1985) (quoting *Lewis v. State*, 529 S.W.2d 550, 533 (Tex. Crim. App. 1975)).

In *Thomas*, the Texas Court of Criminal Appeals noted that in previous cases, the courts considered two factors in determining whether a charge on criminal negligence should have been given: "whether a defendant pointed a loaded gun at another and whether the weapon accidentally discharged." *Id*. Yet, the Texas Court of Criminal Appeals also noted that mere reliance on these two factors was not adequate to evaluate the necessity of a criminal negligence charge because "[e]very case in which someone points a loaded gun at another does not require that a charge on criminally negligent homicide be given. Nor does the allegation of accidental discharge necessarily raise the issue." *Id*. at 850. Instead, the Court of Criminal Appeals noted, "The attendant circumstances from which the defendant's mental state can be inferred must be

7

collectively examined in light of the definition of criminally negligent conduct." *Id*. Thus, it

rejected previous cases which had held that "the pointing of a loaded weapon [was] sufficient to

raise criminally negligent homicide" and held that "[o]ther evidence raising the issue of whether

or not a defendant was aware of the risk must be presented before such charge is required." *Id*.

The Court of Criminal Appeals then noted that testimony or evidence that the accused

"knows a gun is loaded, that he is familiar with guns and their potential for injury, and that he

points a gun at another, indicates a person who is aware of a risk created by that conduct and

disregards the risk" and who is not entitled to an instruction on criminally negligent homicide. *Id*.

(citing *Simpkins v. State*, 590 S.W.2d 129, 144 (Tex. Crim. App. [Panel Op.] 1979)).[8] On the other

hand, where there is evidence the defendant "was unfamiliar with firearms, had never seen the

shotgun before and thought it was unloaded" and "grabbed the shotgun from another person,

intending to scare the deceased, and the gun discharged," those "factors entitled the defendant to

a charge on criminally negligent homicide." *Id*. at 851 (citing *Moore v. State*, 574 S.W.2d 122,

124 (Tex. Crim. App. [Panel Op.] 1978)).

In *Thomas*, the Court of Criminal Appeals ultimately rejected the defendant's theory that

he was entitled to a charge on criminal negligence because

> [t]he thrust of appellant's defense, demonstrated through his witnesses and his own
> testimony, was self-defense and accident, not an unawareness of risk in exhibiting
> a possibly loaded gun under the circumstances. In fact, appellant testified that he
> was afraid of Roy and that he was afraid that if Roy took the gun away from
> appellant[,] Roy would shoot appellant. This testimony reflects an awareness of

---

[8]Simpkins testified that "he had qualified on the rifle range in the Army and that he knew weapons were dangerous."
*Simpkins v. State*, 590 S.W.2d 129, 134 (Tex. Crim. App. [Panel Op.] 1979).

the risk of injury or death involving the use or exhibition of the gun under the circumstances of the offense.

*Id*. at 852.

This case is even further removed from criminal negligence than *Thomas*. In *Thomas*, the defendant testified that "he did know how the gun fired." *Id*. at 849. He also testified that "in order to fire the gun[,] two steps were necessary. First, it had to be cocked; secondly, the trigger had to be pulled." *Id*. at 852. He then testified that he "did not recall ever cocking the gun and denied that he intended to fire it or that he fired it at all. He said that when he pushed Roy[,] the gun discharged." *Id*. In the present case, Adams testified that as he was blacking-out, he "just start[ed] shooting until [Harper] let [him] go." Thus, there is no evidence in the present case that would support a finding that Adams failed to perceive the risk attendant to firing a firearm.

Moreover, although there is no specific evidence of Adams' familiarity with the firearm in this case, a firearm is a deadly weapon per se. *See* TEX. PENAL CODE ANN. § 1.07 (Supp.); *Ex parte Franklin*, 757 S.W.2d 778, 782 (Tex. Crim. App. 1988) (orig. proceeding). Where a firearm is the method of causing death, an intent to kill may be inferred from the accused's use of a deadly weapon per se. *See Flanagan v. State*, 675 S.W.2d 734, 744 (Tex. Crim. App. [Panel Op.] 1982) (op. on reh'g). Thus, merely pointing to an absence of evidence that he was familiar with firearms is not sufficient to establish that Adams failed to perceive the risk associated with firing a firearm towards Adams.

A somewhat similar situation was presented in *Jackson v. State*, 248 S.W.3d 369 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd). In that case, the defendant, Jackson, was engaged in a verbal altercation with the victim. *Id*. at 370. In statements at the scene the following day,

Jackson stated that he had been quarrelling with the victim at Jackson's home. Jackson first told officers at the scene that the victim struck him in the head, but the next day, Jackson told police that the victim did not strike him, but merely confronted him. However, in both statements, Jackson said he pulled a gun from his pocket which accidentally discharged as the two men struggled over it. *Id.* at 370–71. Although Jackson did not testify at trial, he argued that the trial court erred in denying his request for an instruction on criminally negligent homicide. *Id.* at 371.

The Houston Fourteenth Court of Appeals held that "[w]here the defendant kills another person with a deadly weapon per se, more than speculation of this sort is required before the submission of an instruction on . . . criminally negligent homicide is necessary." *Id.* at 372 (quoting *Navarro*, 863 S.W.2d at 206). It concluded that the record did not entitle the appellant to the requested instruction on criminally negligent homicide. The Houston court stated,

> Evidence that appellant drew a handgun, a deadly weapon per se, from his pocket in response to a threat by [the victim] does not alone raise an inference that appellant was unaware of the risk posed by that conduct. To the contrary, drawing a deadly weapon in response to a physical threat indicates that the actor is not only aware of the risk posed by the weapon, but is choosing to exploit that risk.

*Id.* at 372.

As in *Jackson*, Adams claimed to have been arguing with the victim. A physical altercation ensued, and Adams said he pulled a pistol from his pocket. The court of appeals in *Jackson* noted, "Evidence of accidental discharge may raise an inference that the defendant did not perceive a risk of injury or death, for example, when evidence is also presented that the defendant was not aware that the gun was loaded." *Id.* at 373 (citing *Levan v. State*, 93 S.W.3d 581, 585 (Tex. App.— Eastland 2002, pet. ref'd)). Yet, unlike the defendant in *Jackson*, who claimed the weapon

10

accidentally discharged, Adams testified that when Harper put him in a choke hold, he "just start[ed] shooting until [Harper] let [him] go." Thus, this case presents even less justification for a lesser-included instruction on criminally negligent homicide than was present in *Jackson*.

In his brief, Adams argues *Moore v. State* is controlling. We do not agree. The defendant in *Moore* testified that she "grabbed [the] shotgun [which killed the decedent] by the barrel" intending "to scare the deceased, but did not intend to point it at the deceased or pull the trigger." *Moore v. State*, 574 S.W.2d 122, 124 (Tex. Crim. App. [Panel Op.] 1978). She said "afterwards [she] could not believe that it had discharged. She further testified that she had never seen the shotgun before and thought it was unloaded." *Id*. Also, she said that "she was unfamiliar with firearms and had fired a gun only once, twenty years previously." *Id*. The responding law enforcement officer testified that upon his arrival, Moore "was frantic and kept repeating that 'she shot him, and she did not know the gun was loaded.'" *Id*.

Yet, as the court noted in *Jackson*, "[D]rawing a deadly weapon in response to a physical threat indicates that the actor is not only aware of the risk posed by the weapon, but is choosing to exploit that risk." *Jackson*, 248 S.W.3d at 372. Here, as in *Jackson*, the "appellant cites neither evidence that he was unaware that the gun was loaded nor evidence otherwise indicating that he did not appreciate the risk posed by the weapon." *Id*. at 373. Unlike the appellant in *Moore*, there was no testimony or evidence Adams did not think the pistol was loaded. He knew the gun was present because he asked Berrospe for it. And he acknowledged shooting the gun in response to Harper allegedly choking him. Consequently, Adams was not entitled to his requested jury charge

11

instruction on the lesser offense of criminally negligent homicide. We overrule Adams' second point of error.

## IV. Conclusion

For all of the foregoing reasons, the trial court's judgment and sentence are affirmed.


Ralph K. Burgess
Justice


Date Submitted: July 15, 2019
Date Decided: August 20, 2019

Do Not Publish